**UNITED STATES of America**

v.

**Courtney SMITH**

**Civ. A. No. 85-2193.**

United States District Court, W.D. Louisiana, Shreveport Division.

June 23, 1986.

Alice J. Davis, Office of Special Litigation, Tax Div., U.S. Dept. of Justice, Washington, D.C., and Joseph S. Cage, Jr., U.S. Atty., John R. Halliburton, Asst. U.S. Atty., U.S. Dept. of Justice, Shreveport, La., for U.S.

J. Ransdell Keene, Evans, Feist, Auer & Keene, Shreveport, La., for Smith.

## MEMORANDUM RULING

STAGG, Chief Judge.

Courtney Smith promotes and sells a publication entitled "A Manual on How to Establish a Trust and Reduce Taxation," written by Martin Larsen and published by Liberty Lobby, a Washington, D.C. based organization. By complaint filed July 24, 1985, the United States of America seeks a permanent injunction restraining the defendant, his employees and all those in active concert or participation with him from directly or indirectly taking any action in furtherance of the promotion or sale of any interest in an allegedly abusive tax shelter plan known as "The Family Preservation Trust" or any other similar plan, providing advice or assistance to individuals in connection with the establishment of a family preservation trust or similar plan, and from otherwise servicing family preservation trusts. The United States also seeks an order requiring defendant to disclose all other type shelters or trust plans in which defendant has participated, along with the names and addresses of investors in such plans. Additionally, an order is sought requiring the defendant to notify the Internal Revenue Service for a period of five years of his participation in the organization or sale of any tax shelter or plan.

Exercising jurisdiction pursuant to 28 U.S.C. §§ 1340 and 1345, this Court consolidated trial on the merits with the hearing for a preliminary injunction on joint motion

and scheduled this matter for trial on December 5, 1985. Subsequently, Courtney Smith consented to the entry of a temporary restraining order enjoining further distribution and sale of "Family Preservation Trusts," as described in "A Manual on How to Establish a Trust and Reduce Taxation" ("Manual"), and any representations to potential purchasers or owners of family preservation trusts that such trusts were valid legal entities within the meaning of federal income tax laws, thereby permitting various deductions and/or credits. Upon entry of this order, the trial was rescheduled for February 13, 1986. Beginning as scheduled, the trial was delayed after two days of hearing evidence because of the government's failure to provide complete discovery. Thereafter, the bench trial was completed on February 19 and 20, 1986. Pursuant to Fed.R.Civ.P. 52, the required findings of act and conclusions of law are hereafter set out and for the reasons stated, limited injunctive relief against Courtney Smith and his agents, employees and assigns shall be GRANTED.

## THE MANUAL

The Manual is published and sold for the purpose of enabling individuals to create trusts in order to preserve income and reduce income and inheritance taxes. Government's Exhibit 1. It reviews the characteristics and prescribes the means to create various types of trusts, to include the family preservation trust. Also included are 29 "legal" forms, 10 of which are to be used in transferring property, 14 for declarations or indentures of trust, and 5 others for use in operating these trusts. The Manual reviews extensively the income tax advantages of the family preservation trust, to include income-splitting and deductibility of increased administrative expenses, and various steps to avoid probate.

The family preservation trust is characterized by the Manual as the "most important and elaborate" trust plan and forms the primary income tax savings instrument in the Manual. Complete instructions for establishing and operating the family preservation trust are included. Specifically, the reader is advised first to prepare an indenture or declaration of trust, a model of which is included in the Manual, and select a title for the trust which does not call attention to the trustor. Government's Exhibit 1, pages 103 and 109. The person creating the trust, the trustor, should appoint at least two or three trustees who will agree in advance to administer the trust in accordance with the provisions of the indenture. The trustees will ordinarily include the spouse of the trustor and relatives no closer than uncle or niece and/or a close friend. Thereafter, the trustor and trustees sign the trust indenture in the presence of witnesses and a notary public. The spouse of the trustor then conveys to the trustor/grantor all of his or her equity in all properties which are to make up the trust corpus. The Manual advises the trustor and spouse, without limitation, to convey all properties, real and personal, to the trust, with the maintenance and upkeep of these properties subsequently becoming deductible expenses of the trust. The documents reflecting these conveyances must, in conformity with the Manual provisions, be recorded before other documents reflecting the transfer of properties from the trustor to the trust. After all property is transferred to the trustor on forms provided in the Manual, the trustor conveys all assets to the trust on specific forms. In exchange for this property, the trustor receives 200 units of beneficial interest which are completed, dated and inscribed with the names of trustees, delivered to the trustor, and subsequently distributed to the spouse and heirs of the trustor. Upon distribution of the units of beneficial interest, the trust is ready for actual operation, according to fixed procedures set forth in the Manual.

The operation of the trust begins with prescribed minutes for the first meeting of the Board of Trustees. According to these minutes, the trustees approve the steps necessary to creation of the trust, to include accepting the property irrevocably conveyed to the trust in exchange for 200 units of beneficial interest in the trust. Additionally, the minutes require that a majority of members be present and that a majority vote be required to take affirmative action. The trustees also authorize the

expenditure of trust funds for the improvement or enhancement of trust assets by majority vote of the Board of Trustees. After the first meeting adopting the prescribed minutes, the trustees record the trust indenture and all deeds conveying real estate from the trustor to the trust. Thereafter, minutes for the second meeting of the Board of Trustees are to be adopted, showing the distribution of the 200 units of beneficial interest and authorizing the trustees to pay certain expenses of operating the trust, to include office operation, consultations, travel, transportation, conventions and business entertainment, dues and subscriptions, and adequate life and health insurance coverage. The minutes prescribe general guidelines for operation of the trust and authorize the trustees to set their own compensation. The minutes for the second meeting specify that "the TRUSTEES and/or Manager of this TRUST may reside in TRUST headquarters to be available at all times for an emergency that may arise; and to supply maintenance and other services for the benefit of this TRUST and to do so on a contract basis." Upon signing these minutes, the trustees are ready to assume "active operations." Government's Exhibit 1, page 122.

The Manual also includes various suggestions relating to trust operations and reviews certain factual situations illustrating tax benefits to the trustor and his family. Specifically, the Manual advises that a great advantage of creating a trust is that "it can, unlike an individual, deduct from taxable income all administrative expenditures." Moreover, these expenses are deductible even though "actual control will remain within the family structure [with proper appointment of Trustees]." Government's Exhibit 1, page 13. Additionally, the trust can pay the trustor various fees for consultations and managing trust properties; can pay trustees reasonable fees and all expenses associated with meetings of benefit to the trust; can pay the trustor for the use of his own car which was previously leased to the trust; and pay for the use "of headquarters, which may at least in part, also be the domicile of the Trustor and Spouse." *Id.* page 123. According to the Manual, the family home, upon placement in the trust, becomes income producing property with all costs of operation being deductible. Page 126. "All repairs become business expenses; and, most of all, the home can be depreciated like any other business property." *Id.*

MARKETING OF THE MANUAL AND SERVICING OF THE FAMILY PRESERVATION TRUSTS

As previously noted, the Manual was written by Martin A. Larsen and copyrighted in 1978 by Independence House, a Washington, D.C. based organization. The Manual has been subsequently revised five times, the latest revision in 1985. Although the Manual subject of scrutiny by this Court was copyrighted in 1982, the family trust provisions in the 1982 and 1985 manuals are substantially the same.

Since 1977, Courtney Smith has promoted the Larsen trust manual. Smith asserts that he is a leased employee of a family preservation trust, entitled the Courtney Smith Family Preservation Trust, and acts as a consultant to Independence Trust and Liberty Lobby, a taxpayers' lobby in Washington, D.C. Publication rights to the Manual are held by Liberty House; the Manual is published and distributed by Liberty Lobby to Independence Trust, which in turn sells the Manual to purchasers throughout the United States. The Manual is advertised through the "Spotlight", a Liberty Lobby newspaper which has been in publication since 1975, and through oral and written presentations by Courtney Smith throughout the country. It was sold initially for $195, but the price was subsequently increased to $295 per manual. From September 4, 1982 until December 31, 1984, Smith and his associates have sold 1,085 copies of the Manual throughout the United States. Additionally, purchasers of the Larsen Trust Manual routinely receive letters signed by Courtney Smith concerning the latest developments in the use of the manual, the validity of the family preservation trust plan, and progress of what Smith characterizes as the "fight against the IRS."

Smith, through Independence Trust, provides various services to trust owners. In 1984, Smith offered accounting services for trust owners at an annual fee of $60. The accounting fee also includes preparation of the appropriate trust tax forms and, according to a 1984 letter from the Independence Trust to Larsen Trust owners, is used to assist the Independence Trust in fighting the IRS. Additionally, Smith offers to submit written reviews of trust plans for $50, showing the means to conform those trusts to the Larsen Trust provisions reviewed in the Manual. Through his on-going consultation and advice to trust owners, Smith repeats time and again the income tax advantages of the family preservation trust, to include the deductibility of expenses and depreciation on the family home and grounds (Government's Exhibit 9), the validity of the family trust provisions in the Manual, and that the "irrevocable trust is a better TAX SHELTER than anything else you can find." Government's Exhibit 12.

## IRS REVIEW OF THE FAMILY PRESERVATION TRUST

In September, 1982, Leah Bass, an Internal Revenue Agent, reviewed the 1980 individual tax returns submitted by Smith. Subsequently, Bass reviewed other tax returns submitted by Smith, to include his individual tax returns and the fiduciary tax returns for the Smith Family Preservation Trust for the years 1980, 1981, and 1982. As a result of this examination, in September, 1983, at a closing conference attended by Smith and IRS Agent Bass, Smith was advised that the Smith Family Preservation Trust was considered a "sham" and that it violated the grantor-trust provisions of the Internal Revenue Code. Smith was then advised that the entire transaction, the creation and operation of the trust, was considered as a whole and that the substance of the transaction established that it was a sham. Specifically, Smith was advised that the interposed third party through whom assets were passed in creating the trust was disregarded. It was merely a "paper transaction" which was considered meaningless by the IRS. To support its position, the IRS provided Smith with lists of ap-

proximately 50 cases addressing the validity of trusts for tax purposes first in April, 1984, and then again in December, 1984. Smith acknowledged receipt of the lists of case authority and stated that he had studied each of these cases along with others, to include *Schulz v. C.I.R.*, 686 F.2d 490 (7th Cir.1982).

## STATUTORY BASIS FOR INJUNCTIVE RELIEF

On the basis of purported false representations in the Manual, the Government initiated this action for injunctive relief pursuant to §§ 6700 and 7408 of the Internal Revenue Code. Section 7408, entitled "Action to enjoin promoters of abusive tax shelters, etc.," provides:

(a) Authority to seek injunction.—A civil action in the name of the United States to enjoin any person from further engaging in conduct subject to penalty under section 6700 (relating to penalty for promoting abusive tax shelters, etc.) may be commenced at the request of the Secretary. Any action under this section shall be brought in the district court of the United States for the district in which such person resides, has his principal place of business, or has engaged in conduct subject to penalty under section 6700. The court may exercise its jurisdiction over such action (as provided in section 7402(a)) separate and apart from any other action brought by the United States against such person.

(b) Adjudication and decree.—In any action under subsection (a), if the court finds—

(1) that the person has engaged in any conduct subject to penalty under section 6700 (relating to penalty for promoting abusive tax shelters, etc.), and

(2) that injunctive relief is appropriate to prevent recurrence of such conduct, the court may enjoin such person from engaging in such conduct or in any other activity subject to penalty under section 6700.

Section 6700, entitled "Promoting abusive tax shelters, etc.," provides:

(a) Imposition of Penalty.—Any person who

(1)(A) organizes (or assists in the organization of)—

(i) a partnership or other entity,

(ii) any investment plan or arrangement, or

(iii) any other plan or arrangement, or

(B) participates in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes (in connection with such organization or sale)—

(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

(B) a gross valuation overstatement as to any material matter,

shall pay a penalty equal to the greater of $1,000 or 10 percent of the gross income derived or to be derived by such person from such activity.

. . . . .

(c) Penalty in addition to other penalties. The penalty imposed by this section shall be in addition to any other penalty provided by law.

In substance, these provisions penalize any person who assists in the organization of any plan or arrangement and makes or furnishes a material statement regarding tax advantages from that arrangement which he knows or has reason to know is false or fraudulent. Under such circumstances, the district court may enjoin such person from engaging in such conduct where the injunction is "appropriate to prevent reoccurrence of such conduct." The purpose of these provisions is to focus IRS efforts on the promoter of abusive tax shelters, rather than the user or purchaser of abusive tax plans. S.Rep. No. 97–404, 97th Cong., 2d Sess., *reprinted in* 1982 U.S. Code Cong. & Ad.News 781, 1014. Considering that widespread marketing and use of tax shelters undermines public confidence in the fairness of the tax system and that abusive tax schemes impose a disproportionate burden on IRS resources, § 6700 was enacted to permit an attack on the source of such plans, i.e. the organizer and salesman. *Id.* The ability to seek injunctive relief prior to examination of returns after widespread adoption of abusive tax plans "enables the Internal Revenue Service to protect the integrity of the tax laws and to protect potentially innocent investors against widespread marketing of such tax schemes." *Id.* at 1016.

Courtney Smith admits that he promotes and sells the Manual, provides tax advice to trust owners, and organizes the efforts of trust owners in the fight against the Internal Revenue Service. Thus, Smith admits threshold elements essential to § 6700, requiring this Court to address only falsity, materiality, knowledge of misrepresentation, and likelihood of recurrence.

### a. False or Fraudulent Statements

In its complaint, the Government alleges that the following statements, among others, concerning income tax consequences of operating a family preservation trust are false and/or fraudulent within the meaning of § 6700 of the Code: (1) that the trustee-spouse becomes an adverse party, thereby avoiding the grantor-trust provisions, I.R.C. § 671, *et seq.;* (2) that the grantor and trustee-spouse can rent their domicile after transferring it to the trust, thereby making it income producing property with consequent deductions for depreciation, maintenance and repairs; (3) that expenses of day-to-day trust operations, to include that portion of the home labeled as business headquarters for the trust, are deductible; (4) that the trust can deduct the cost of operating cars for the benefit of the trust and deduct the depreciation and expenses of that portion of the domicile which the grantor and spouse designate as trust headquarters; and (5) that the grantor can lease a personally owned car to the trust, permitting deductions for depreciation and expense of operation, and receive cash payments from the trust. The defendant adamantly rejects these contentions, asserting

that all trust provisions comply with the laws of the United States, to include the Internal Revenue Code.

### i. Grantor-Trust Provisions

■ The "grantor-trust" provisions of the Internal Revenue Code, 26 U.S.C. §§ 671–77, govern whether the grantor is treated as owner of the trust property and whether the trust will be recognized for income tax purposes. The grantor-trust provisions establish that trusts will be ignored for tax purposes and that the grantor will be treated as the appropriate taxpayer whenever the grantor retains substantially unfettered powers of disposition. *See, United States v. Buttorff,* 761 F.2d 1056, 1061 (5th Cir.1985), *Schulz v. C.I.R.,* 686 F.2d 490, 495 (7th Cir.1982), *Vnuk v. C.I.R.,* 621 F.2d 1318 (8th Cir.1980). Retention of the beneficial enjoyment of the trust, and the power to control and liquidate the trust either unilaterally or with concurrence of someone who is not an "adverse party," undermines the concept of independent control of the trust property and invalidates the trust for federal tax purposes. On the other hand, the meaningful concurrence of an "adverse party," one with a beneficial interest and the power to assert that interest in contradiction to the trustor, ensures the absence of continuing control by the grantor and satisfies these code provisions. For these purposes, an "adverse party" is defined by 26 U.S.C. § 672(b) as "any person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust."

The favorable tax consequences associated with the family preservation trust, as represented in the Manual and by Courtney Smith, are predicated on the creation of a valid trust, one comporting with the grantor trust provisions by properly designating one or more adverse party trustees. Smith adamantly asserts that the trustee-spouse is an adverse party, contending that the interspousal transfer of property subsequently conveyed by the trustor to the trust creates the adversity required by I.R.C. § 671, *et seq.* The cases addressing this issue, however, have disregarded such transactions as lacking in economic substance and clearly demonstrate the fatal defects in the defendant's position. In *United States v. Buttorff, supra,* the wife conveyed her real and personal property to the husband who then conveyed all family property to trust. Looking to the timing and purpose of the transaction, the United States Court of Appeals for the Fifth Circuit ignored the spouse's conveyance on the fundamental grounds that substance predominates over form or, in the alternative, because the parties did not treat the transfer as a sale or a gift. *Id.* Although the transfer purportedly created adversity between the husband and wife, the appellate court found that "[a] trust is not sheltered from the operation of the grantor trust provisions by an artificial construction of adversity between parties." 761 F.2d at 1061, *citing United States v. Buttorff,* 563 F.Supp. 450, 454 (N.D.Tex.1983). Similarly, in *Schulz v. C.I.R., supra,* the wife had conveyed all her interest in jointly held property to the husband prior to creation of the trust. Raising substance above form, the 7th Circuit also disregarded the conveyances between the spouses, which were effected as a required step in the creation of a trust; again, the parties failed to treat the transfer as a sale or a gift. 686 F.2d at 498. (*See also Neeley v. United States,* 775 F.2d 1092 (9th Cir.1985), where wife's transfer to husband for subsequent conveyance into trust did not alter wife's status as a grantor).

Looking to the substance and purpose of the transactions recommended by Smith and the Larsen Manual, this court finds that the interspousal transfer creates nothing more than the facade of a meaningful transaction. Though facially attractive, the paper conveyance cannot create the required adversity nor can it shield such a trust from the express provisions of the Code. The transferring spouse, upon subsequently becoming a trustee, becomes a grantor-trustee. Under the provisions of the family preservation trust created pursuant to the Manual, the transferring spouse then has the authority to distribute

the beneficial interest of the trust to himself or herself. Neither the Manual, nor Smith, requires that another beneficial owner have a power over the beneficial enjoyment of the trust. Retention of unfettered control over the beneficial enjoyment of the trust, unconstrained by the required consent of an adverse party, violates the clear provisions of the Code.

■ Furthermore, the trust indenture set forth in the Manual merely requires the consent of the majority of trustees to disperse net income or any portion of the corpus of the trust. The Manual also states that two or three trustees should be appointed. Even assuming the trustee-spouse to be adverse, the Larsen design does violence to the grantor-trust provisions of the Internal Revenue Code. I.R.C. § 677 prohibits the grantor or nonadverse party from having the discretion to distribute income to the grantor or the grantor's spouse "without the approval or consent of any adverse party." The "consent" contemplated by this provision must be "effective consent," not merely the formal consent of a noncontrolling interest. *See Schulz v. C.I.R.*, 686 F.2d at 495. Where majority rule applies, then adversity within the nonmajority is not meaningful adversity, and consent, or lack thereof, of the minority cannot comport with the grantor-trust provisions. *Id.* Accordingly, representations by Smith that adversity of the transferring spouse creates meaningful adversity are simply in error. Moreover, assuming that another of the trustees holds a beneficial interest in the trust and is, therefore, an adverse party, the Larsen Trust still fails. I.R.C. § 677 requires a grantor to be treated as the owner of any portion of the trust out of which income may be distributed to the grantor or his spouse without the consent of an adverse party. For the purposes of this section, the spouse cannot be considered as the adverse party asserting rights in contradiction to those of the grantor. Treas.Reg. Section 1.677(a)–1(b)(2); *Vercio v. Commissioner*, 73 T.C. 1246, 1258 (1980). Again, where the Manual permits majority rule, the voice of a single, and minority, adverse trustee does

not prevent the retention of control proscribed by the Code.

■ In addition, other courts have consistently held that retention of control of the trust property in the trust family constitutes a sham for tax purposes. *E.g., Neely v. United States, supra; Zmuda v. C.I.R., supra; United States v. Buttorff, supra.* "[An] economic substance formula [i.e., whether there is a real change in the economic relation between parties] may be used to determine whether a family trust is valid, *Markosian v. Commissioner*, 73 T.C. 1235 (1980), and whether a trust is a grantor-trust for tax purposes, *Hanson v. Commissioner*, 696 F.2d 1232, 1234 (9th Cir. 1983)." *Zmuda v. C.I.R.*, 731 F.2d 1417, 1421 (9th Cir.1984). There is no real question of substantial economic change in the relationship of the parties to trusts created pursuant to the Manual. Just as additional layers of paperwork do not give meaning to the interspousal transfer or vitality to the subsequent trust under the grantor-trust provisions, the creation of a trust scheme which converts the family's personal activities into trust activities, with family expenses becoming expenses of trust administration, is a mere sham which cannot be considered to be valid. Introduction of the trust, through which a taxpayer ostensibly conducts his day-to-day affairs, does not convert otherwise personal expenses into necessary and reasonable expenses of a business. *Schulz*, 686 F.2d at 493. Where the only economic effect of a transaction is to create income tax deductions, it is a mere sham. *Neely v. United States*, 775 F.2d at 1094; *Zmuda v. C.I.R.*, 731 F.2d at 1421.

ii. Gift-Leaseback of Family Residence

■ Also considered in resolving whether representations by Smith are erroneous is the validity of the gift/transfer-leaseback of the family residence. To determine the validity of such a transaction, four factors are considered: (1) whether the grantor of the trust retains substantially the same control over the property; (2) whether the lease was written and requires payment of a reasonable rent; (3) whether

the leaseback has a bona fide business purpose; and (4) whether the grantor possesses a "disqualifying" equity pursuant to I.R.C. § 162(a)(3). *Rosenfield v. C.I.R.,* 706 F.2d 1277 (2d Cir.1983); *Quinlivan v. C.I.R.,* 599 F.2d 269 (8th Cir.1979). Where the transferee trust is defective, it is a mere fiction and the transfer to that "trust" is meaningless, regardless of other factors. In such circumstances, the grantor retains effective control over the property, and the gift-leaseback is nugatory, creating no positive tax consequences. On the other hand, assuming the trust to be valid, the court must look, not only to the purpose of the leaseback, but also to the purpose of the original transfer, in search of a bona fide purpose for the scheme and to determine the consequent availability of tax benefits. *Van Zandt v. C.I.R.,* 341 F.2d 440 (5th Cir.1965); *Matthews v. C.I.R.,* 520 F.2d 323 (5th Cir.1975). Where the conveyance and leaseback do not have a legitimate business purpose, but are designed solely for tax benefits, the transaction is invalid. *Id.* Absent a legitimate business purpose, the user of the Manual cannot convert personal expenses of maintaining and repairing the family residence into deductible expenses for income tax purposes. Although the *Van Zandt* inquiry ultimately depends on a factual evaluation of each particular case, *Van Zandt,* 341 F.2d at 444, Smith represents that the transfer and subsequent leaseback are valid upon compliance with detailed formalities in the Manual, *regardless* of other circumstances. An individual cannot rent his own residence to himself and create tax deductions. *Audano v. U.S.,* 428 F.2d 251 (5th Cir.1970). Again, these representations are contrary to controlling jurisprudence.

Accordingly, without further inquiry, it is inescapable that the Larsen trust is invalid for tax purposes, that representations concerning its conformity with the grantor-trust provisions of the Code are erroneous and misleading, and that statements in the Manual assuring tax benefits through deduction of otherwise personal expenses are false.

b. Materiality

■ Section 6700 is violated by engaging in the sale of any investment plan by furnishing statements about tax benefits which the person knows or has reason to know are false or fraudulent as to *any material matter.* In proving materiality here, the government need not demonstrate that a purchasing taxpayer has relied on the purported misrepresentations. Rather, "a matter is considered material to the arrangement 'if it would have a substantial impact on the decision making process of a reasonably prudent investor.'" *Buttorff,* 761 F.2d at 1062, *citing* S.Rep. No. 97–494, 97th Cong.2d Sess. 267 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 781, 1015.

■ The Government introduced evidence that various trusts created in conformity with the Manual have been subject to IRS review. Specifically, the IRS reviewed the Courtney Smith Family Preservation Trust, which was created substantially in conformity with the Manual, and advised that the trust would not be valid for tax purposes. Additionally, Darrel Vince Kaplan created a family preservation trust which conformed, according to Courtney Smith, with the provisions of the Larsen Trust; that trust has also been disregarded for income tax purposes by the Internal Revenue Service. The record is clear that many others have purchased the Manual based upon representations by Smith concerning the tax consequences of the family preservation trust.

Considering that the trust is defective for violation of the grantor-trust provisions and for lack of substance, thereby discrediting representations concerning tax benefits, it is logical to conclude that those purchasing the Manual on the basis of erroneous assertions would not have purchased it had they known of these defects. The absence of substantial tax benefits is, without doubt, a material matter to a reasonably prudent investor/taxpayer.

c. Knowledge

■ As previously noted, Courtney Smith received two lists of approximately

50 cases addressing the validity of family trusts. Furthermore, Smith specifically acknowledged familiarity with *Schulz v. C.I.R., supra,* and testified that he continuously reviewed and studied the tax consequences of such trusts. Although the defendant, through the testimony of a certified public accountant, attempts to distinguish the provisions of the Larsen Trust from defective trusts considered by various courts, the witness failed to address the express language of those opinions, as previously quoted herein. *See, Schulz v. C.I.R., supra; Neeley v. C.I.R., supra; United States v. Buttorff, supra.* Although the interspousal transfer of property has been characterized as "an artificial construction of adversity between parties", Smith continues to represent that these conveyances fully effect the formal transaction and create adversity for the purposes of grantor-trust provisions. Furthermore, the oft repeated, fundamental principle of substance over form appears to be unrecognized by the defendant. The refusal to recognize that principle, and the jurisprudence addressing the grantor-trust provisions, cannot be used to support a claim of misunderstanding or an absence of falsity. Such a claim would affront the repeated circuit court opinions with which Smith is admittedly familiar. Rather, a finding of falsity is consistent with the Manual's efforts to dissuade trust owners from seeking professional advice concerning the validity of the trust. In summary, the evidence is clear that Smith has knowledge of these defects. Refusal to admit the existence and propriety of these decisions cannot be used to shield Smith from the provisions of §§ 6700 and 7408.

PREVENTION OF RECURRENCE

Finding that the defendant has engaged in conduct subject to penalty under § 6700, an injunction restraining the defendant from engaging in such conduct may be appropriate if "injunctive relief is appropriate to prevent recurrence of such conduct." Section 7408(b)(2). The substance of Smith's representations to Larsen Trust owners through the Independence Trust newsletters are most revealing.

Smith states that increased numbers of "Larsen Trust owners" is absolutely essential to the fight against the IRS "if we are to beat them." Government's Exhibit 8. Smith characterizes IRS inquiry into the validity of the Larsen Trust as an attempt "to find a reason (excuse) legal or illegal, to call Dr. Larsen's Trust Manual an abusive tax shelter and thereby get it off the market." Government's Exhibit 10. While in conference with IRS Agent Bass, Smith declared that he would continue to his fight against the Internal Revenue Service, through the use of legal or illegal means. In light of these statements and Smith's adamant refusal to recognize the express language of the cases addressing grantor-trust provisions and similar family preservation trusts, it is clear that Smith will not tailor his conduct to that required by § 6700.

In considering whether injunctive relief is necessary to prevent recurrence of such conduct, the United States Court of Appeals for the Fifth Circuit reviewed the factors addressed in parallel injunction actions seeking to enforce securities laws. Using the defendant's past conduct to determine the likelihood of future conduct, the following factors must be considered: (1) whether the defendant has been previously liable for illegal conduct, (2) the degree of scienter, (3) whether the infraction is an isolated occurrence, (4) whether the defendant maintains that his past conduct was blameless, and (5) whether his occupation would place him in a position where future violations could be anticipated. *Buttorff,* 761 F.2d at 1062, *citing Securities and Exchange Commission v. Commonwealth Chemical Security, Inc.,* 574 F.2d 90, 100 (2d Cir.1978).

A review of these factors in light of Smith's conduct and statements fully supports the conclusion that an injunction is necessary to prevent recurrence of his conduct. Smith continues to assert that the family preservation trust permits the deduction of depreciation, repairs, and maintenance on the family residence, that the expenses of maintaining personal property become deductible as administrative ex-

penses of the trusts, and that the interspousal transfer creates adversity, despite the jurisprudence with which he is admittedly familiar. Smith is a consultant to the Independence Trust and the Courtney Smith Family Preservation Trust, with the job of promoting and selling this Manual. Without an injunction, his occupation directly places him in a position to continue to promote this Manual. Accordingly, an injunction is found to be necessary to restrain violations of the I.R.C. by Courtney Smith.

## INJUNCTION AS AN EQUITABLE REMEDY

■ Courts imposing and upholding injunctive relief pursuant to §§ 6700 and 7408 have considered the traditional factors considered in imposing this equitable remedy. *United States v. Buttorff, supra; United States v. White*, 769 F.2d 511 (8th Cir.1985). These factors include: (1) a showing of substantial likelihood that the plaintiff will prevail on the merits; (2) a substantial threat of irreparable injury if injunctive relief is denied; (3) the threat and injury to plaintiff outweighs the potential harm to the defendant; and (4) the public interest will not harmed by the granting of the injunction. *E.g., Canal Authority of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974).

The United States has demonstrated that the defendant furnished false statements as to material matters which he knew or had reason to know were false and fraudulent. Considering that these statements were made in conjunction with the promotion and sale of the family preservation trust, the United States has proven the likelihood of success on the merits. Second, the Government shows that a case-by-case review of family preservation trusts containing the stated defects would create a disportionate burden on the Internal Revenue Service. During fiscal year 1984, the Internal Revenue Service reviewed approximately 1,800 returns containing family preservation trusts with apparently defective provisions; 92.5 percent of those returns were found to be erroneous, yielding increased taxes of approximately $8,900

per return. Furthermore, the Internal Revenue agents auditing those returns spent, on the average, 14.4 hours completing the examination. Additionally, Tom DeWeese, a senior regional analyst for the Internal Revenue Service, testified that family estate trusts which did not specifically state the name of the person creating the trust make it more difficult for IRS review. Considering that the Manual particularly recommends the adoption of a name which does not call attention to the trustor, examination of a Larsen trust causes special burdens. Furthermore, James W. Snyder, an IRS agent who audited the 1983 personal and trust return of the Daryl Kaplans, testified that he spent 41 hours in examining the trust return alone. The agent's time, just as the average of 14.4 hours required in reviewing family estate trusts, does not include additional hours spent by other agents and employees of the Internal Revenue Service who receive and prepare the documents for initial review. Considering that an injunction would prevent the needless drain on resources required to audit individual accounts and to litigate the same issues in repeated trials, the government has demonstrated a substantial threat of irreparable injury. such injunctive relief need only specify that the defendant conform his conduct to that required by law. Third, the potential harm from the injunction to the defendant is substantially outweighed by the threatened injury to the United States. And lastly, the public interest, as demonstrated by legislative history underlying §§ 6700 and 7408, will be promoted through injunctive relief. Accordingly, consideration of the traditional factors supporting an equitable remedy reveals that imposition of injunctive relief is appropriate.

## FIRST AMENDMENT

■ The defendant asserts that an injunction would effect a prior restraint of his right to promulgate information regarding the creation of trusts and income tax planning. In *United States v. Buttorff*, a similar argument arose where Buttorff had been enjoined from promoting and selling a "Constitutional Pure Equity Trust", from

representing that such trust produces federal tax benefits, and from performing services, to include counseling and tax return preparation, in connection with this tax plan. The First Amendment argument was rejected, first, because Buttorff's representations concerning purported tax benefits were made in an effort to promote and sell certain packaged trust forms and personal services, all for profit to Buttorff. 761 F.2d at 1066. Second, Buttorff's representations were found to advocate conduct declared by the courts to be contrary to the provisions of the Internal Revenue Code. And lastly, since the injunction was narrowly tailored and construed to enjoin only "such commercial speech which [was] shown to be both misleading and likely to promote illegal activity, such representations [were] not protected by the First Amendment against restraint authorized by § 7408 and properly found necessary in a particular case to prevent recurrence of the denounced conduct." *Id.* at 1066–67. Since the injunction did not constitute a total ban on Buttorff's commercial speech, but was limited to material misrepresentations or omissions regarding tax benefits, the defendant's First Amendment rights were fully protected.

Similarly, Smith's First Amendment rights may also be fully protected. As in *Buttorff,* the defendant advertises and promotes the sale of the Manual, along with various services to Trust owners through the Independence Trust. Representations concerning compliance with the grantor-trust provisions and the deductability of otherwise personal expenses are clearly deceptive. Smith promotes the use of a tax scheme which affronts fundamental tax principles. As commercial speech, which effectively promotes unlawful activity, it is not shielded by the First Amendment. *Buttorff,* 761 at 1066, *citing Pittsburgh Press Co. v. The Pittsburgh Commission on Human Relations,* 413 U.S. 376, 389–90, 93 S.Ct. 2553, 2560–61, 37 L.Ed.2d 669 (1973). Since the injunction will not proscribe all commercial speech, but will be limited to specific representations concerning tax benefits which are misleading, enforcement of the policies recognized in §§ 6700 and 7408 does not infringe the defendant's constitutionally protected rights.

Smith attempts to distinguish the teachings of *Buttorff,* relying upon the concurring opinion of Justice White in *Securities and Exchange Commission v. Lowe,* 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985). In *Lowe,* an injunction prohibiting Lowe from publishing and distributing for profit an investment advisory service was found to be invalid under the Investments Advisors Act of 1940. Specifically, the defendant's publications fell within a statutory exclusion for bona fide publications and, therefore, were not subject to restraint under the statute. Accordingly, the Investment Advisors Act survived the constitutional attack and Lowe was permitted to continue his practices. In his concurring opinion, Justice White found that the majority opinion reflected "a thinly disguised conviction that the Act is unconstitutional as applied to prohibit publication of newsletters by unregistered advisors." 105 S.Ct. at 2581. Although Justice White goes on to raise issues concerning whether the promulgation of newsletters constituted commercial speech for the purposes of the First Amendment, his resolution of the issue pretermitted the need to determine whether the newsletters contained fully protected speech or commercial speech. "The Act purports to make it unlawful for [Lowe] to publish newsletters containing investment advice and to authorize an injunction against such publication. The ban extends as well to legitimate, disinterested advice as to advice that is fraudulent, deceptive, or manipulative. Such a flat prohibition or prior restraint on speech is, as applied to fully protected speech, presumptively invalid and may be sustained only under the most extraordinary circumstances." 105 S.Ct. at 2586, *citing New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). Accordingly, the means chosen to advance a legitimate governmental interest was believed to be extreme and objectionable. Justice White would have held that application of the Act was "too blunt an instru-

ment to survive even the reduced level of scrutiny called for by restrictions on commercial speech." *Id.*

[13] Likewise, Courtney Smith asserts that an injunction pursuant to §§ 6700 and 7408 cannot survive First Amendment scrutiny. Smith's position, however, was effectively distinguished from that of Lowe by the United States Court of Appeals by the Fifth Circuit in *Buttorff.* Where, as in *Buttorff,* (1) the defendant promotes his own personal services through commercial speech, and (2) his speech is found to be inherently deceptive, (3) where this speech invites its users to break the law for financial gain and (4) simultaneously, personally profits the speaker, an injunction closely tailored to the statutory provisions will be found to be appropriate. This court, based on the testimony and evidence adduced at trial, adopts the distinctions set forth in *Buttorff,* and finds that *Lowe* is no help to defendant. Accordingly, a narrowly drawn injunction will not infringe Courtney Smith's First Amendment rights.

## CONCLUSION

Courtney Smith actively sells the family preservation trust plan; advises purchasers and users of substantial tax advantages generated by the use of these trusts; but refuses to observe various strictures of the Internal Revenue Code. This conduct is subject to penalty under the express provisions of § 6700; pursuant to § 7408, this court finds that injunctive relief is required to prevent recurrence of such conduct. Accordingly, for reasons herein stated, the government's motion for injunctive relief must be GRANTED.

An Order consistent with the terms of this Memorandum Ruling shall issue herewith.