**UNITED STATES of America, Plaintiff,**

v.

**ESTATE PRESERVATION SERVICES, etc., et al., Defendants.**

**Civ. No. S971166–LS–GGH.**

United States District Court, E.D. California.

Oct. 5, 1998.

---

Charles P. Hurley, U.S. Department of Justice, Washington, DC, Paul L. Seave, United States Attorney, Sacramento, CA, for plaintiff.

Joe Alfred Izen Jr., Pro Hac Vice, Bel Aire, TX, for Estate Preservation Services, a Trust, Estate Preservation Services, Inc., Robert L. Henkell.

Stephen J. Russell, Law Offices of Stephen J. Russell, San Ramon, CA, for Charles Scott Grace.

Spencer K. Malysiak, Law Offices of Spencer K. Malysiak, Gold River, CA, for William L. Sefton.

### MEMORANDUM OF DECISION AND ORDER

*(Findings of Fact and Conclusions of Law Included)*

MILTON L. SCHWARTZ, District Judge.

This case is presently before the court on plaintiff's motion for preliminary injunction pursuant to sections 7402(a) and 7408 of the Internal Revenue Code. The court conducted an extended evidentiary hearing on this motion on February 3–4, 17–18, March 24–25, and May 5, 1998. Throughout these proceedings, the following appearances were made: Charles P. Hurley, Esq., appeared on behalf of plaintiff, the United States of America (also "the government"); Joe Alfred Izen, Jr., Esq., appeared on behalf of defendants Estate Preservation Services, a Trust, Estate Preservation Services, Inc., and Robert L. Henkell; Stephen J. Russell, Esq., appeared on behalf of defendant Charles Scott Grace; and Spencer K. Malysiak, Esq., appeared on behalf of defendant William L. Sefton.

## I. Factual and Procedural Background.

Defendant Estate Preservation Services ("EPS")[1] is in the business of, *inter alia*, marketing trusts and other asset protection tools. In 1992, EPS began selling irrevocable, non-grantor trusts called "As-

---

1. Estate Preservation Services, a Trust, and Estate Preservation Services, Inc., are separately named as defendants in this action. For ease of reference, they are collectively referred to hereinafter simply as "EPS."

set Preservation Trusts" ("APTs"). EPS marketed and sold these trusts through a nationwide multi-level marketing network of financial planners.

Defendant Robert L. Henkell was the central figure in promoting and organizing the activities of EPS and created a variety of different trust entities to facilitate his business operations. As part of his effort to market APTs, Henkell drafted a training manual entitled "Asset Preservation Trusts—Description, Use & Benefits" ("APT Manual"). The APT Manual contains numerous statements with respect to the allowability of tax deductions or credits that could purportedly be derived from APTs. Henkell also conducted seminars, during which he advised individuals on how to create and use these trusts to generate tax deductions and reduce tax liability. Defendant Charles Scott Grace is an attorney who was involved in reviewing and producing the actual trust documents. Defendant William L. Sefton is a certified public accountant who was an executive vice president of EPS. The precise involvement of defendants Grace and Sefton in this venture will be addressed separately infra.

In 1995, the Internal Revenue Service ("IRS") learned of APTs while conducting audits of individual taxpayers. Suspecting illegal tax-sheltering activity, the IRS launched an investigation and subsequently concluded that APTs were abusive tax shelters being used as mechanisms for claiming excessive and/or unwarranted tax deductions. As a result, the IRS formally assessed penalties in the amount of $1,254,000 each against Henkell and EPS pursuant to section 6700 of the Internal Revenue Code.[2] Shortly thereafter, Henkell began marketing "Estate Management Trusts" in lieu of "Asset Preservation Trusts," and distributed new brochures. At this time, Henkell also formed New Dynamics

Foundation ("NDF"), and advocated the creation of private charitable foundations as mechanisms for reducing tax liability. According to the government, these changes in approach were prompted by defendants' efforts to mask their illegal activities and further evade the IRS.

The government initiated this action on June 23, 1997, naming the following five defendants: (1) Robert L. Henkell; (2) Estate Preservation Services, a Trust; (3) Estate Preservation Services, Inc.; (4) William L. Sefton; and (5) Charles Scott Grace. The government seeks to reduce to judgment tax penalties previously assessed against Henkell and EPS and also seeks to enjoin all defendants from giving any further abusive tax-sheltering advice.

After considering the admissible evidence proffered by all parties during the course of the preliminary injunction hearing, the written submissions, and the record herein, the court now renders its decision on the motion.

## II. Standard of Review.

The government's request for injunctive relief is governed by section 7408 of the Internal Revenue Code, which provides as follows:

(a) **Authority to seek injunction.**—A civil action in the name of the United States to enjoin any person from further engaging in conduct subject to penalty under section 6700 (relating to penalty for promoting abusive tax shelters, etc.) ... may be commenced at the request of the Secretary....

(b) **Adjudication and decree.**—In any action under subsection (a), if the court finds—

(1) that the person has engaged in any conduct subject to penalty under section 6700 (relating to penalty for promoting abusive tax shelters, etc.) ... and

---

**2.** Unless otherwise specified, all further statutory references are to the Internal Revenue

Code, 26 U.S.C.

(2) that injunctive relief is appropriate to prevent recurrence of such conduct,

the court may enjoin such person from engaging in such conduct or in any other activity subject to penalty under section 6700 or section 6701.

§ 7408 (West 1989). Therefore, in order to be entitled to an injunction, the government must prove that: (1) the defendants have engaged in conduct that subjects them to penalty under section 6700; and (2) an injunction is necessary to prevent recurrence of such conduct.

Section 6700(a) authorizes the imposition of a penalty on any person who:

(1)(A) organizes (or assists in the organization of) —

(i) a partnership or other entity,

(ii) any investment plan or arrangement, or

(iii) any other plan or arrangement, or

(B) participates (directly or indirectly) in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes or causes another person to make or furnish (in connection with such organization or sale) —

(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

(B) a gross valuation overstatement as to any material matter,

shall pay, with respect to each activity described in paragraph (1), a penalty equal to $1,000 or, if the person establishes that it is lesser, 100 percent of the gross income derived (or to be derived) by such person from such activity. . . .

§ 6700(a) (West Supp.1998).

In the alternative, the government seeks injunctive relief under section 7402(a). This section authorizes district courts to issue injunctions "as may be necessary or appropriate for the enforcement of the internal revenue laws." § 7402(a).

 The government bears the burden of proving each element necessary for the issuance of an injunction by a preponderance of the evidence. *See United States v. H & L Schwartz, Inc.*, 1987 WL 45223, at *6 (C.D.Cal.1987), *aff'd sub nom Bond v. United States*, 872 F.2d 898 (9th Cir. 1989). Because section 7408 expressly authorizes the issuance of an injunction, the traditional requirements for equitable relief need not be satisfied. *See Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir.), *cert. denied*, 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983); *United States v. Buttorff*, 761 F.2d 1056, 1059 (5th Cir.1985).

Because each of the individual defendants has had a different type and level of involvement with the allegedly abusive tax shelters challenged here, the court will separately address each defendant in determining whether the government is entitled to a preliminary injunction.

### III. Whether the Government is Entitled to an Injunction Against Defendants Henkell and EPS.

 The court will first jointly consider whether the government is entitled to an injunction against Henkell and EPS. Because Henkell was the creator of EPS and directed its business activities, the same analysis applies and the same result should obtain as to both of these defendants.

### A. Whether Henkell and EPS Have Engaged in Conduct Subject to Penalty Under Section 6700.

In order to be entitled to injunctive relief under section 7408, the government

must first establish that the defendants have engaged in conduct subject to penalty under section 6700. This requires the following four elements to be satisfied:

(1) Defendant has organized or sold (or assisted in the organization or sale of) an entity, plan or arrangement;

(2) defendant has made or caused to be made false or fraudulent statements concerning tax benefits to be derived from the entity, plan, or arrangement;

(3) defendant knew or had reason to know the statements were false or fraudulent; and

(4) the false or fraudulent statements pertained to a material matter.

## 1. Whether Henkell and EPS Participated in the Sale of an Entity, Plan, or Arrangement.

The government must first establish that Henkell and EPS participated in the organization or sale of an entity, plan, or arrangement. It is undisputed that both of these defendants were participating in the sale of APTs and/or charitable foundations, both of which qualify as an entity, plan, or arrangement within the meaning of section 6700(a)(1)(A).

## 2. Whether Henkell and EPS Made False Statements.

The APT Manual contained numerous statements with regard to the allowability of tax deductions or credits that could purportedly be derived from an APT. Materials produced by NDF with respect to charitable foundations also contained statements as to the tax benefits that could be derived from a charitable foundation. In support of its request for a preliminary injunction, the government appears to target four specific representations contained in these materials. The court will separately address each of these in determining whether Henkell and EPS made false statements within the meaning of section 6700(a)(2).

## a. The Basis for Property Transferred Into Trust.

First, the government contends that Henkell and EPS falsely represented that taxpayers can transfer equipment into a trust at no cost to the trust, giving the trust a higher basis in the equipment than that available to the taxpayer. Specifically, the government targets the following statements contained in the APT Manual:

> End up with the asset placed into the APT having a new income tax basis equal to the asset's current fair market value. With either method, the intent is the same. Provide liability protection and secure a tax advantage allowed under the legal "tax avoidance" structuring principles. From a tax standpoint, the goal is to start depreciation over from a new tax basis and/or provide a new basis that can defer or eliminate capital gain if the asset is sold by the Trust.

APT Manual at 6–7.

This representation is false under the statutes governing depreciation. Section 1015 governs the basis for property acquired by gifts and transfers in trust and provides in pertinent part as follows:

> If the property was acquired after December 31, 1920, by a transfer in trust ..., *the basis shall be the same as it would be in the hands of the grantor* increased in the amount of gain or decreased in the amount of loss recognized to the grantor on such transfer under the law applicable to the year in which the transfer was made.

§ 1015 (emphasis added).

The foregoing statute clearly provides that the basis for property transferred in trust "shall be the same as it would be in the hands of the grantor." This section provides no authority for the proposition that a taxpayer can acquire a fair market value basis for property simply by transferring it to a trust. If the basis of the taxpayer making the transfer into trust is zero, the basis of the trust in the equipment is also going to be zero.

Henkell's suggestion that the property was actually exchanged for Units of Beneficial Interest ("UBIs") does not alter the analysis. Section 1031, which governs like-kind exchanges, expressly excludes from its provisions property that is exchanged for "certificates of trust or beneficial interests." *See* § 1031(a)(2)(E). In this court's opinion, the "UBIs" advocated by Henkell are materially indistinguishable from "certificates of beneficial interest" and therefore cannot qualify as a like-kind exchange under section 1031. Moreover, a review of the "certificate" which purported to grant these UBIs reveals that they do not have an identifiable value that can be either transferred or sold.

Therefore, the representation that property transferred at no cost into trust can gain a fair market value basis is false.

### b. Upstreaming Income.

Second, the government contends that the APT Manual falsely represented that supplies and services can be purchased for a business through a trust at a significant mark-up, thereby transferring income from the business to the trust in order to avoid taxes. This technique, which Henkell calls "upstreaming," was described in the APT Manual as follows:

Through simple "upstreaming" techniques (covered in a later paragraph) and other payments, APTs provide an effective method of income splitting. If a business is involved in the "upstreaming" process, business profit can be significantly reduced. This will reduce, or possibly eliminate, self-employment taxes.

APT Manual at 9. In describing the upstreaming process, the APT Manual further states as follows:

Upstreaming APT's provide equipment, supplies, services, and/or accounts receivable factoring to the existing business at a significant increase in cost. For example, if the business used specific supplies costing $30,000 per year, this Trust could provide them to the business for $50,000 per year and make a $20,000 profit. This moves $20,000 out of the net business profit and could save as much as $3,060 in self-employment tax or FICA (15.3%).

APT Manual at 12. The APT Manual provides several examples of upstreaming profits, including:

Many businesses use outside contract labor or sub-contractors to accomplish some business activities. This might also include outside services such as bookkeeping, janitorial, security, sales and marketing, and public relations. Purchasing these services through an APT at a significant mark-up provides an excellent way to move additional business profit.

*See* APT Manual at 13.

■ The foregoing representations are not supportable under the Internal Revenue Code. Under section 162(a), all trade or business deductions must be "ordinary and necessary" expenses. Courts have construed section 162(a) so as to avoid collusive mark-ups designed solely to gain a tax advantage. Thus, if a transaction as a whole is intended only to divert income and reduce tax liability, it is not an allowable deduction under section 162(a). *See Audano v. United States*, 428 F.2d 251, 256–57 (5th Cir.1970); *B. Forman Co. v. Commissioner*, 453 F.2d 1144, 1160 (2nd Cir.1972).

The court finds the clear import of the "upstreaming" technique as described in the APT Manual to be that money can be moved between related entities solely to gain a tax advantage. Because the camouflaged assignment of income does not qualify as an "ordinary and necessary" business expense within the meaning of section 162(a), this qualifies as a false statement.

### c. Deductibility of Personal Expenses/Depreciation of Owner–Occupied Home.

The government next challenges the representation that APTs could be used to deduct personal expenses and depreciate a

home. The government specifically targets the following statement:

> Our first area of attention is the personal residence Asset Preservation Trust. This trust converts the current family home from a personal residence into an income producing property.... Moving the residence into an asset preservation trust can provide additional tax write-offs for utility and maintenance costs that are currently nondeductible expenses. Depreciation of the home and furnishings from their current fair market value also adds to the tax benefits.

APT Manual at 14–15.

■ The representation that a taxpayer can deduct utility and maintenance expenses associated with a personal residence is not supportable under the Internal Revenue Code. "It is fundamental to our income tax regime that personal consumption expenditures ... do not generate income tax deductions unless they are somehow inextricably linked to the production of income." *Schulz v. Commissioner*, 686 F.2d 490, 492–493 (7th Cir.1982). The clear implication from the APT Manual is that by simply placing a personal residence into a trust, the residence is transformed into an income producing property. However, placing a home into a trust does not make personal expenses, such as maintenance costs and living expenses, deductible. *See Buttorff*, 761 F.2d at 1060. The failure to explain that expenses must have a business nexus in order to be deductible is fraudulent. *See id.*

■ Nor can a personal residence placed in trust be properly depreciated when the taxpayer is still living in the residence. Depreciation deductions are only available for property used in a business or used for the production of income. *See* § 167 (West Supp.1998). *See also Sacks v. Commissioner*, 69 F.3d 982, 986 (9th Cir.1995). Therefore, the representation that a taxpayer can depreciate an owner-occupied personal residence by simply placing it into a trust is fraudulent.

#### d. Donations Made to Charitable Foundations.

Finally, the government contends that defendants gave improper advice pertaining to the establishment of charitable foundations. Specifically, the government contends that defendants encouraged taxpayers to set up charities, called "donor-directed foundations," for their own personal benefit in order to amass assets tax free. As part of its effort to market these foundations, NDF produced written materials advising taxpayers how to create these foundations. Specifically, NDF produced a brochure entitled "Description & Operation of Your Own Foundation" ("NDF Brochure") and a manual entitled "Operation Manual for a Donor–Directed Foundation" ("NDF Manual"). The NDF Brochure provided as follows:

> Suppose a person wanted to build a large charitable foundation to provide continued income during retirement years. The foundation might pay a person for management and consulting services and/or for involvement in charitable endeavors. A foundation may also pay for all actual expenses related to a charitable endeavor or activity without generating any taxable income to the participants. Since a Donor may contribute up to 50% of his or her income to a public foundation, establishment of a donor-directed foundation with NDF could become a very large amount of foundation wealth at retirement, especially when you consider the tax free growth within the charity.

NDF Brochure at 9.

The government contends that the foregoing statement is false because it communicates that these foundations can be created solely for the private inurement of those donating the money.

Charitable contributions are generally deductible under § 170 (West Supp.1998). This section defines a charitable contribution, in pertinent part, as a contribution or gift to or for the use of:

854

A corporation, trust, or community chest, fund or foundation—

(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to animals;

(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual

§ 170(c)(2).

■ The Supreme Court has held that "[a] payment of money generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return." *United States v. American Bar Endowment,* 477 U.S. 105, 116–17, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986) Furthermore, to qualify as a charitable contribution, the donor must have surrendered dominion and control over the funds. *See Pollard v. Commissioner,* 786 F.2d 1063, 1067 (11th Cir.1986). Thus, statements that an individual can use a charitable foundation to disburse funds back to the donor or the donor's family are false.

**e. Conclusion as to False Statements.**

Accordingly, the court finds that the four different statements targeted by the government are not supportable under the Internal Revenue Code and are hence false within the meaning of section 6700(a)(2)(A). In an attempt to defeat the present request for injunctive relief, Henkell contends that the government must prove that the representations made were "clearly illegal under existing precedent." As support for this assertion, Henkell cites *United States v. Dahlstrom,* 713 F.2d 1423 (9th Cir.1983), *cert. denied,* 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984). In *Dahlstrom,* the defendants were criminally charged with, *inter alia,* violating section 7206(2) of the Internal Revenue Code for their role in promoting abusive tax shelters. In order to satisfy its burden of proof under section 7206(2), the government was required to prove that the defendants willfully aided in the presentation and preparation of false income tax returns. Courts have interpreted "willfully" to require proof of a specific intent to violate the law. *Id.* at 1427. Following their conviction by jury trial, the defendants appealed and argued that the government had not satisfied its burden of proving specific intent to violate the law because the validity of the particular tax shelters at issue had not yet been addressed by any clearly relevant precedent. *Id.* at 1428. The Ninth Circuit agreed and reversed the convictions.

Relying upon *Dahlstrom,* Henkell contends that because the statements challenged by the government all implicate grey areas of tax law that lack clear precedent, the government cannot establish that any of these statements were clearly illegal. The court is not persuaded by this contention. Firstly, the court is not convinced that these areas of tax law are as ambiguous as Henkell suggests. To the contrary, it appears to the court that Henkell manipulated potential ambiguities of the tax laws in order to gain an advantage.

In any event, the court is not persuaded that the rule articulated in *Dahlstrom* applies to the present case. This action involves a civil proceeding initiated by the government, while *Dahlstrom* involved a criminal prosecution. Moreover, the statute at issue in *Dahlstrom* required the government to prove specific intent as an element of the substantive offense, which is a more stringent burden than the "knew or had reason to know" standard imposed under section 6700. Therefore, defendants' reliance on *Dahlstrom* is misplaced.

**3. Whether Henkell or EPS Knew or Had Reason to Know of the Falsity of the Statements.**

■ The government must also establish that Henkell and EPS knew or had reason to know of the falsity of the state-

ments made. See § 6700(2)(A). When determining whether this element has been satisfied, the following factors are relevant: (1) a particular defendant's familiarity with tax matters; (2) his level of sophistication and education; and (3) whether he obtained the opinion of knowledgeable professionals. *See, e.g., United States v. Kaun,* 827 F.2d 1144, 1149 (7th Cir.1987).

■ After considering the relevant factors, the court finds that Henkell knew or had reason to know that the representations he was making were false. While not a licensed CPA, Henkell is an educated individual who has endeavored to gain knowledge of tax principles by taking courses at various institutions and by referencing resource materials. Throughout the course of his testimony, Henkell was able to quickly refer to various sections of the Internal Revenue Code and appeared to be fairly well-versed in tax matters.

Although Henkell did apparently consult with professionals, including attorneys and certified public accountants, he acknowledged that some of these professionals disagreed with him as to the propriety of specific representations contained in the APT Manual. Because Henkell knew some of his representations were subject to scrutiny and because he actively sought to recruit new sales agents, Henkell had an obligation to further investigate the legitimacy of the representations made in the APT Manual and in the NDF materials. *See United States v. Campbell,* 897 F.2d 1317, 1321–22 (5th Cir.1990). Henkell, however, chose to ignore the opinions of those who were skeptical as to the legality of his statements and instead associated with individuals who unquestioningly agreed to further his scheme. In fact, testimony elicited at the preliminary injunction hearing established that some of the professionals with whom Henkell claimed to have consulted actually relied on Henkell's "legal" advice.

After listening to Henkell's testimony, and in light of his level of education and his familiarity with tax issues, this court concludes that he either knew or had reason to know of the falsity of the statements he was making.

### 4. Whether These Statements Pertained to a Material Matter.

■ Lastly, the government must establish that the statements made pertained to a "material" matter. If a particular statement has a substantial impact on the decision-making process or produces a substantial tax benefit to a taxpayer, the matter is properly regarded as "material" within the meaning of section 6700. *See Buttorff,* 761 F.2d at 1062. Here, all of the statements pertain to the availability of tax deductions, credits, or other mechanisms for reducing tax liability. As a result, the statements clearly qualify as "material" within the meaning of section 6700.

### B. Whether an Injunction is Necessary to Prevent Recurrence.

Having determined that Henkell and EPS have engaged in conduct subject to penalty under section 6700, the court must now determine whether "injunctive relief is appropriate to prevent recurrence of such conduct." § 7408(b)(2). This element has been found to be satisfied where there is a reasonable likelihood of continued fraudulent conduct. *See Kaun,* 827 F.2d at 1150. Various factors have been identified as relevant to this inquiry: (1) whether mechanisms are in place for continuing the business or scheme; (2) whether the defendant had a high degree of knowledge and level of intent; (3) whether the actionable conduct was an isolated occurrence; (4) whether the defendant insists on the legality of his actions; and (5) whether the defendant has provided assurances that he will change his behavior in the future. *See, e.g., Kaun,* 827 F.2d at 1150; *United States v. United Energy Corp,* No. C–85–3655 RFP(CW), 1987 WL 4787, at *13 (N.D.Cal. Feb. 25, 1987); *United States v.*

*Campbell,* 704 F.Supp. 715, 728 (N.D.Tex. 1988).

After considering the relevant factors, the court finds that Henkell's conduct is likely to recur. Shortly after the government formally assessed penalties against Henkell and EPS, Henkell altered his strategy, began marketing "Estate Management Trusts" in lieu of "Asset Preservation Trusts," and distributed new marketing materials. He also formed NDF and began advocating the creation of charitable foundations as a mechanism for reducing tax liability. While the newly conceived Estate Management Trusts addressed some of the IRS's concerns, they still retained some of the fraudulent features of the APTs. As for the sale of charitable foundations through NDF, the court has already concluded that Henkell made false representations as to the tax-free status of these purported donor-directed foundations. Henkell's modification of schemes and his continued insistence on the legality of his representations certainly creates doubt as to whether he will refrain from promoting abusive tax shelter schemes in the future.

Henkell's level of education and the nature of the enterprise he conducted also demonstrate that his conduct is likely to recur. As previously discussed, Henkell is highly educated and has familiarity with a wide range of tax issues. He marketed and sold APTs through a nationwide multilevel marketing network of financial planners. Given the number of APTs that were sold, it cannot be said that the objectionable conduct was merely an isolated occurrence. Henkell also created an exceedingly complex organizational structure of various entities to facilitate his business operations. To a large degree, this network and the mechanisms for continuing the business enterprise appear to still be in place.

For all of the foregoing reasons, the court finds that the objectionable conduct is likely to recur absent the issuance of an injunction.

The court is not persuaded by Henkell's contention that the granting of injunctive relief impermissibly infringes on his First Amendment right to free speech. The United States Supreme Court has held that "the federal government [is] free to prevent the dissemination of commercial speech that is false, deceptive, or misleading." *See Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 638, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). In the particular context of suits for injunctive relief under section 7408, federal courts have consistently rejected First Amendment challenges on the ground that representations concerning abusive tax shelters are untruthful and therefore fall within the permissible scope of regulation. *See Buttorff,* 761 F.2d at 1066.

Here, Henkell promoted the use of a tax scheme that contradicted fundamental tax principles and specifically advocated the use of deductions not allowable under the Internal Revenue Code. Because the speech that the government seeks to enjoin qualifies as false or misleading commercial speech, Henkell's First Amendment challenge must fail.

Based on the foregoing, the court finds that the government has satisfied its burden and thus is entitled to a preliminary injunction as against Henkell and EPS.

## IV. Whether the Government is Entitled to an Injunction Against Defendant Charles Scott Grace.

### A. Whether Grace Has Engaged in Conduct Subject to Penalty Under Section 6700.

#### 1. Whether Grace Participated in the Sale of an Entity, Plan, or Arrangement.

 Defendant Grace is an attorney who was intimately involved in the sale of APTs. Specifically, Grace was responsible for reviewing trust applications, discussing the application with the purchaser, and

answering any questions the purchaser had. In light of these facts, Grace clearly participated in the sale of APTs.

In addition to his involvement with APTs, Grace also participated in the initial discussions which led to the formation of NDF. Additionally, after Henkell resigned from NDF as president and board member, Grace assumed the presidency and joined the board of directors. Given these facts, Grace clearly participated in the sale of an entity, plan, or arrangement within the meaning of section 6700(a)(1)(A).

### 2. Whether Grace Made False Statements.

According to Grace's testimony, he discussed the representations made in the APT Manual with clients. Specifically, Grace admitted telling clients that: (1) property could be transferred into a trust at its fair market value and depreciated; (2) supplies and services could be purchased for a business through a trust at a significant mark-up, thereby transferring income from the business to the trust; and (3) mortgage payments, insurance, and upkeep on a personal residence could be deducted. *See* 2–18–98 Tr. at 74:2–3, 81:23–82:17, 83:11–15, 93:13–25, 95:9–96:4. As discussed supra in section III.A.2, these statements are false under the Internal Revenue Code. Thus, the court finds that Grace did make false statements regarding the tax benefits to be derived from APTs.

### 3. Whether Grace Knew or Had Reason to Know of the Falsity of the Statements.

The court is satisfied that Grace had reason to know that the statements challenged by the government were false. Grace is an attorney with an L.L.M. in tax law, and therefore possesses the knowledge and resources necessary to perform legal research. He also knew that several people, including other attorneys, questioned the legality of the statements contained in the APT Manual. Instead of independently investigating the legality of

these statements, Grace chose to rely on the advice of others, including non-attorneys such as Henkell. Since basic legal research would have revealed the falsity of statements contained in the APT Manual, Grace cannot escape liability by purporting to rely on others he considered more knowledgeable. His complete failure to examine the legality of statements made in the APT Manual even in light of their questionable efficacy provides ample support for the conclusion that he had reason to know that these statements were false.

### 4. Whether These Statements Pertained to a Material Matter.

As previously discussed, a statement pertains to a material matter if it would impact the decision-making process of a reasonably prudent investor. *See Buttorff,* 761 F.2d at 1062. Here, since the statements made pertain to the availability of tax deductions and credits, they are material.

### B. Whether an Injunction is Necessary to Prevent Recurrence.

The court finds Grace's conduct is likely to recur. As an attorney who primarily practices in the area of trusts, it is likely that Grace will again confront this type of abusive tax shelter scheme. *See Kaun,* 827 F.2d at 1150. Furthermore, Grace has shown an exceptional lack of judgment in his dealings with Henkell and EPS. He claims to have relied on non-attorneys in arriving at his conclusions that the products he was selling were legal, and he has also failed to perform any independent legal research into the representations he was making. In fact, even throughout the course of these proceedings, Grace continued to insist on the legality of some of the representations the court has found to be false. *See* 2–18–98 Tr. at 173:4–22. Moreover, while claiming to represent the purchasers of trusts, he closely associated with the seller of those trusts and at times acted as Henkell's attorney. In the court's opinion, this raises some serious ethical

concerns and also demonstrates a propensity to become involved in abusive schemes in the future.

As with Henkell, the modifications in approach also support the issuance of an injunction. When the IRS attacked the APTs, Grace began marketing Estate Management Trusts and also became involved with NDF. Based on Grace's persistent involvement with the various organizations at issue here, the court finds a reasonable likelihood of continued fraudulent conduct. *See Kaun,* 827 F.2d at 1150.

 Grace's insistence that he will not participate in any further tax evasion schemes does not alter the court's analysis. The court need not accept such self-serving statements, and the cessation of wrongful activity does not alleviate the necessity for an injunction because the defendant is free to return to unlawful behavior. *See United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

In light of all of the circumstances, the court finds that an injunction is necessary to prevent recurrence of Grace's involvement in the organization and sale of abusive tax schemes.

## V. Whether the Government is Entitled to an Injunction Against Defendant William L. Sefton.

### A. Whether Sefton Has Engaged in Conduct Subject to Penalty Under Section 6700.

### 1. Whether Sefton Participated in the Sale of an Entity, Plan, or Arrangement.

 Although Sefton did not directly sell any APTs, he did act as a vice president of EPS and was active in soliciting new sales agents for EPS. Additionally, he received compensation in the form of overrides for the sale of APTs by those agents he recruited. Furthermore, Sefton assisted in the organization of NDF and was a member of the initial board of directors. In light of these facts, the court finds that Sefton participated in the sale of an entity, plan, or arrangement within the meaning of section 6700(a)(1)(A).

### 2. Whether Sefton Made False Statements.

The court also finds that Sefton made statements concerning tax benefits to be derived from APTs and from charitable foundations established under NDF. Facts elicited at the hearing demonstrate that Sefton was intimately involved in EPS and NDF, both of which published materials containing fraudulent information regarding tax benefits. In an attempt to defeat the government's request for injunctive relief against him, Sefton insists that he did not directly make any statements concerning the tax benefits to be derived from APTs. However, in addition to authorizing a penalty against those who make statements, section 6700 also authorizes a penalty against those who "cause another person to make or furnish statements regarding tax benefits." § 6700(a)(2). As an executive vice president of EPS who actively recruited new sales agents and who received overrides from sales, Sefton did cause others to make statements regarding potential tax benefits to be derived from APTs. Additionally, as a board member of NDF, Sefton approved the use of the NDF Brochure which contained fraudulent representations regarding donor-directed foundations. As a result of the approval of these materials for distribution, sales agents furnished those fraudulent statements to taxpayers. Therefore, even absent proof that Sefton personally directly made statements regarding the tax benefits of APTs or charitable foundations, the court finds that he had sufficient involvement with these entities to support a finding that he caused statements to be made.

This conclusion comports with the approach taken by other courts holding that individuals involved in abusive tax schemes cannot escape liability simply by employ-

ing others to actually make the false statements. *See United Energy Corp.*, 1987 WL 4787, at *12; *Agbanc, Ltd. v. United States*, 707 F.Supp. 423, 427 (D.Ariz.1988). Employing that principle here, Sefton cannot avoid liability simply by insisting that the statements were made by others. Sefton clearly acted in concert with others in attempting to promote these abusive tax shelter arrangements. Therefore, Sefton made fraudulent statements regarding the tax benefits of both APTs and charitable foundations.

### 3. Whether Sefton Knew or Had Reason to Know of the Falsity of the Statements.[3]

The court also concludes that Sefton knew or had reason to know that the statements were false or fraudulent. Sefton is a licensed CPA with a master's degree in accounting from the University of Southern California. By his own description, he practices primarily in the area of personal tax returns and audits, and clearly possesses sophisticated knowledge regarding the income tax system. He also has the skills and resources necessary to perform highly competent research regarding the availability of potential tax benefits. Sefton's reliance on "expert" advice regarding the validity of NDF practices does not overcome his experience and ability to personally investigate these practices. In an effort to distance himself from the fraudulent schemes at issue and demonstrate that he had no knowledge as to the propriety of particular statements made, Sefton repeatedly insisted that he never investigated the claims made regarding the APTs because they were not relevant to his clients. After listening to Sefton's testimony, evaluating his level of involvement with APTs and with NDF, and considering his education and professional background, the court finds that Sefton had reason to know of the falsity of the representations.

Moreover, his efforts to distance himself from the APTs implies that he may have been aware of the questionable legality of the representations being challenged by the government.

### 4. Whether These Statements Pertained to a Material Matter.

For reasons articulated supra with respect to defendants Henkell, EPS, and Grace, the representations made by Sefton did pertain to a "material" matter.

### B. Whether an Injunction is Necessary to Prevent Recurrence.

Sefton's practice as a CPA focusing on individual tax returns and audits makes it likely that he will come into contact with other abusive tax schemes in the future. *See Kaun*, 827 F.2d at 1150. Moreover, Sefton has refused to take any responsibility for his involvement in either EPS or NDF, and has repeatedly insisted that he has no opinion on the fraudulent statements at issue. As with Grace, the court is not persuaded by his self-serving assertions that he will refrain from engaging in fraudulent conduct in the future. Therefore, the court finds that an injunction against Sefton is appropriate to prevent future wrongful conduct with respect to abusive tax schemes.

### VI. Conclusion.

1. The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1340 and 1345 and 26 U.S.C. §§ 7402(a) and 7408.

2. Plaintiff is entitled to a preliminary injunction, pending trial and judgment in this court or further orders herein, enjoining and restraining defendants (1) Estate Preservation Services, a trust, (2) Estate Preservation Ser-

---

**3.** Sefton's attempt to elevate this element to a requirement of willfulness fails. *United States v. Nordbrock*, 828 F.2d 1401 (9th Cir.1987), cited by Sefton in support of this proposition, indicates that the "knew or had reason to know" standard is applicable to cases decided under section's 6700 and 7408, and cannot be read to require a finding of willfulness in this action. *See id.* at 1403–04.

vices, Inc. (3) Robert L. Henkell, (4) Charles Scott Grace, and (5) William L. Sefton, and their respective officers, directors, employees, attorneys, and agents from:

a. organizing, promoting, marketing, or selling "Asset Preservation Trusts," "Estate Management Trusts," and any other abusive tax shelter, plan, or arrangement which advises or encourages taxpayers to attempt to violate internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities; and

b. organizing, selling, or assisting in the organization of an entity or otherwise promoting any plan or arrangement based upon:

(1) the representation that property can be transferred into a trust by a taxpayer at no cost to the trust, for "units of beneficial interest" or otherwise, giving the trust a higher basis in the equipment than available to the taxpayer;

(2) the representation that equipment transferred to a trust by a business can be leased back to the business at inflated rates thereby transferring income from the business to the trust for purposes of avoiding taxes;

(3) the representation that personal expenses can be paid by a trust in order to obtain tax benefits not available to individuals;

(4) the representation that owner-occupied personal residences of taxpayers can be transferred to a trust and then depreciated as a business asset; and

(5) the representation that individual taxpayers can deduct contributions made to their own charities and later disburse the funds back to themselves or their families.

3. Because the court finds that the government is entitled to injunctive relief under section 7408(a), the court need not address the government's alternative contention that it is entitled to injunctive relief under section 7402(a).

IT IS SO ORDERED.

### *PRELIMINARY INJUNCTION*

Pursuant to the Memorandum of Decision and Order filed October 5, 1998, defendants (1) Estate Preservation Services, a trust, (2) Estate Preservation Services, Inc., (3) Robert L. Henkell, (4) Charles Scott Grace, and (5) William L. Sefton, and their respective officers, directors, employees, attorneys, and agents are hereby enjoined and restrained, pending trial and judgment in this court or further orders herein, from:

a. organizing, promoting, marketing, or selling "Asset Preservation Trusts," "Estate Management Trusts," and any other abusive tax shelter, plan, or arrangement which advises or encourages taxpayers to attempt to violate internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities; and

b. organizing, selling, or assisting in the organization of an entity or otherwise promoting any plan or arrangement based upon:

(1) the representation that property can be transferred into a trust by a taxpayer at no cost to the trust, for "units of beneficial interest" or otherwise, giving the trust a higher basis in the equipment than available to the taxpayer;

(2) the representation that equipment transferred to a trust by a business can be leased back to the business at inflated rates thereby transferring income from the business to the trust for purposes of avoiding taxes;

(3) the representation that personal expenses can be paid by a trust in order to obtain tax benefits not available to individuals;

(4) the representation that owner-occupied personal residences of taxpayers can be transferred to a trust and then depreciated as a business asset; and

(5) the representation that individual taxpayers can deduct contributions made to their own charities and later disburse the funds back to themselves or their families.

IT IS SO ORDERED.