UNITED STATES of America,
Plaintiff,

v.

Irwin SCHIFF, Cynthia Neun, Lawrence N. Cohen aka Larry Cohen, individually and doing business as Freedom Books, www.livetaxfree.com, www.paynoincometax.com, and www.ischiff.com, Defendants.

No. CV–S–03–0281–LDG RJJ.

United States District Court,
D. Nevada.

June 16, 2003.

Blaine Welsh, U.S. Atty's Office, Las Vegas, NV, for U.S.

Noel Spaid, Del Mar, CA, for Defendants.

## *ORDER*

GEORGE, District Judge.

The United States has filed a motion for a preliminary injunction against defendants pursuant to 26 U.S.C. §§ 7402, 7407 and 7408. According to the complaint, defendants doing business as Freedom Books are promoting through consulting services, websites, and tax-scam packages the filing of "zero-income" federal income tax returns, and directing their customers to inundate the IRS, federal courts and Department of Justice with frivolous lawsuits and IRS hearings. The complaint alleges that defendants recruit customers to the zero-income tax return scheme by falsely stating that income earned by individuals is not subject to federal income taxes. Defendants then advise customers to file zero-income tax returns; assist customers to submit false W–4 forms to stop withholding taxes from wages; and help customers prepare other fraudulent tax documents.

After a noticed hearing, the court on March 19, 2003, issued a temporary restraining order (# 13) which enjoined defendants from engaging in activity subject to penalty under 26 U.S.C. § 6700 (promoting abusive tax shelters), § 6701 (aiding and abetting understatement of tax liability), § 6694 (preparing any part of a return or claim for refund that includes an unrealistic position); § 6695 (failing to sign and furnish the correct identifying

number on tax returns that they prepare), and engaging in other fraudulent or deceptive conduct that substantially interferes with the proper administration of the IRS Code. The activities proscribed by the restraining order include the sale and distribution of the book *The Federal Mafia* and other books, videotapes, seminars, packages, and consultations that provide instructions on how to file or submit false or fraudulent returns and tax forms.

A preliminary injunction hearing was conducted on April 11, 2003. Following the hearing, the court ordered post-hearing briefs be filed by May 1, 2003, and allowed reply briefs to be filed on or before May 12, 2003. Upon consideration of the evidence and arguments, the court makes the following determinations, which shall be construed as findings of fact and conclusions of law.

I. *Jurisdiction*

Title 26 U.S.C. section 7408 authorizes an action to enjoin promoters of abusive tax shelters "from further engaging in conduct subject to penalty under section 6700 (relating to penalty for promoting abusive tax shelters, etc.) or section 6701(relating to penalties for aiding and abetting understatement of tax liability)." 26 U.S.C. § 7408(a).[1] Section 7408 requires a finding that the person has engaged in the conduct subject to penalty under §§ 6700 or 6701, and that injunctive relief is appropriate to prevent recurrence of such conduct.

Section 6700(a) authorizes the imposition of a penalty on any person who:

(1) (A) organizes (or assists in the organization of)—

(i) a partnership or other entity,

(ii) any investment plan or arrangement, or

(iii) any other plan or arrangement, or

(B) participates (directly or indirectly) in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes or causes another person to make or furnish (in connection with such organization or sale) -

(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

(B) a gross valuation overstatement as to any material matter . . . .

Title 26 U.S.C. section 7407 authorizes a court to enjoin a person from acting as an income tax return preparer if that person has repeatedly (1) engaged in conduct subject to penalty under § 6694 (which prohibits the preparation or submission of a return containing an unrealistic position), or § 6695 (which mandates that a return preparer sign returns and include his identifying number); (2) misrepresented his eligibility to practice before the IRS, or otherwise misrepresented his experience or education as a return preparer, or (3) engaged in any other fraudulent or deceptive conduct substantially interfering with the proper administration of the tax laws.

1. Defendants argue that the § 7408 language authorizing injunctions against persons who "further engage in conduct subject to penalty," must be read to require the government to have imposed a penalty before an injunction would be authorized. A plain reading of the statute, however, requires only that an individual be engaging in activity "subject to penalty." Because defendants offer no case law in support, their argument must be rejected.

Title 26 U.S.C. section 7402(a) authorizes district courts to issue injunctions "as may be necessary or appropriate for the enforcement of the internal revenue laws."

▬▬▬ The government bears the burden of proving each element necessary for the issuance of an injunction by a preponderance of the evidence. *United States v. Estate Preservation Servs.*, 202 F.3d 1093, 1098 (9th Cir.2000). Because § 7408 expressly authorizes the issuance of an injunction, the traditional requirements for equitable relief need not be satisfied. *Id.*

## II. *Violations of § 6700*

▬▬▬ To establish a violation of § 6700 (promoting abusive tax shelters), warranting an injunction under § 7408, the United States must show that:

(1) the defendants organized or sold, or participated in the organization or sale of an entity, plan, or arrangement;

(2) they made or caused to be made false or fraudulent statements concerning the tax benefits to be derived from the entity, plan or arrangement;

(3) they know or had reason to know that the statements were false or fraudulent;

(4) the false or fraudulent statements pertained to a material matter; and

(5) an injunction is necessary to prevent recurrence of this conduct.

*Estate Preservation*, 202 F.3d at 1093. Here, the government has proved these elements as to each of the individual defendants.

### A. *Organization, sale and participation in organization or sale of plan or arrangement*

The government's documentation in support of its motion for a preliminary injunction shows that defendants have organized or sold, or participated in the organization or sale of a plan or arrangement which assists customers to file or submit false federal income tax returns and W–2 forms.[2] Defendant Schiff sells books, tapes and other products over the internet and through Freedom Books, his store in Las Vegas, Nevada, and other avenues, with the purpose of advising purchasers about how to "legally stop paying taxes." Cantrell Decl., attachment at 003 (hereafter "Cantrell"). These products and packages of products are advertised from between $10 to over $1600. Schiff also markets seminars and workshops to instruct attendees on how to stop paying taxes at $150 per person/$200 per couple. Cantrell, at 016. Schiff also offers $50 letter-writing services and "personal consults" for $300 per hour. Schiff's organization promises to "guide you in selecting the materials you need to be Income Tax Free!" Cantrell, at 003.

Schiff's operation is based on the premise that "the income tax is voluntary," and cites a variety of statements and information to that effect. Cantrell, at 005–014. Not surprisingly, many of these statements and information are taken out of

---

**2.** Defendants argue that their witnesses testified that it was "their own independent research (initially triggered by the book) that led them to the belief [in Schiff's theories]," and therefore, what they purchased from Schiff was not a tax shelter, but information to "lead them to the law." Such a pseudo-psychological dissection of what motivates Schiff's customers to adopt his scheme is untenable. Schiff's customers' personal sub-stantiation of Schiff's theories does not negate the influence of the scheme on their actions. As discussed later, the government presented evidence of, and Schiff's own witness testified to, the use of the exact materials provided in Schiff's publications. No one could independently arrive, without deviation, at the exact same theories, and create the identical materials contained in Schiff's scheme.

context, and none of them carries the weight of legal precedent on the legitimacy of the tax positions Schiff takes. The plan then introduces customers to Schiff's zero-income tax scheme. Cantrell, at 002, 040–042. Pursuant to the scheme, Schiff advises his customers that "[f]or income tax purposes, you can legally report 'zero' income and pay no income taxes regardless of how much you might have earned." Cantrell, at 003. Schiff justifies this claim by asserting that there is "no law requiring anyone to pay income tax." Cantrell, at 002. Rather, Schiff takes the position that the Constitution limits Congress' power to tax only "corporate profits." According to Schiff, "[f]or tax purposes, 'income' only means corporate 'profit.' Therefore, no individual receives anything that is reportable as 'income.' In essence we have a profits tax, not an income tax." Cantrell, at 060.

Central to Schiff's zero-income scheme is the book he authored entitled *The Federal Mafia: How the Government Illegally Imposes and Unlawfully Collects Income Taxes* (hereafter *The Federal Mafia*). Schiff identifies *The Federal Mafia* as the starting point of his program, and states that "[i]t shows you how to file the zero return, stop your wage withholding, and explains the basics." Cantrell, at 062. Schiff also advertises his program and services on the internet through testimonials, some of which identify only *The Federal Mafia* as the resource for avoiding paying taxes. *See* Cantrell, at 029, 030, 031, and 035–036. *The Federal Mafia* is priced at $38, and is promoted throughout Schiff's online marketing of his seminars and materials. Advertising for the book states that it "provides the information and documents required to immediately stop your wage withholding, and to file a request for a refund of all the taxes you paid." Cantrell, at 018. *The Federal Mafia* also features prominently in each of Schiff's in-

structional packages separately priced at $80, $175, $250, $295, $795, and $1060.

*The Federal Mafia* is largely autobiographical, containing in large part Schiff's anti-tax and anti-government diatribes and theories. The book also contains Schiff's postulations about the voluntariness of income tax, and how federal income tax assessment is the true tax scam. *The Federal Mafia* also touts Schiff as a "tax consultant," and references his background in accounting, economics, actuarial science and law as qualifications for his services. *The Federal Mafia*, back cover.

True to its promise, *The Federal Mafia* contains specific instructions on how to stop employers from withholding taxes by submitting an "exempt" W–4, and how to file "zero income" tax returns. *See The Federal Mafia*, at 154–68, 244–45, 274–75. Schiff's promotional materials include a sample "Zero Return" and advise that it be filed "only by attaching to it our two-page attachment." Cantrell, at 040. *The Federal Mafia* includes a one page attachment to be filed with the "Zero Return." *See The Federal Mafia*, at 275. At the bottom of the page is the following "important" notice:

> This attachment has now been expanded to two pages and includes vital issues not fully developed in The Federal Mafia. The new attachment cites 17 court decisions, 13 statutes, and numerous other official sources to establish your claim that you had "zero" income and are entitled to a full refund of all the taxes you paid for that year-a claim not previously developed in this book. The new, expanded attachment is automatically included when The Federal Mafia is ordered from Freedom Books. If you purchased this book in a bookstore, send us your sales slip and a stamped, self-addressed envelope, and we will send you the new attachment at no charge

*The Federal Mafia,* at 275. Thus, the two-page attachment updates the existing attachment in the book at no additional charge.

The Internal Revenue Service has identified nearly 5,000 zero-income federal income tax returns filed by some 3,100 customers of Schiff's organization during the past three years using Schiff's two-page attachment referenced in *The Federal Mafia,* supplied with its purchase, and identified by promotional materials as a requirement to the filing of the zero-income tax return tutored by *The Federal Mafia* and other of Schiff's instructional services. Henline Decl.(hereafter "Henline"), at para. 14. In addition to that documentary evidence, during the preliminary injunction hearing, Schiff's witness Robert Wesley testified that he obtained the zero-income return that he filed from *The Federal Mafia.* The IRS estimated that these filings represented $56 million in attempted tax evasion. Henline, at para. 17.

Defendant Neun sells Schiff's tax materials, promotes Schiff's packages, and charges a fee to appear with customers at IRS audits and IRS appeals hearings as a "witness." Cantrell, at 066, 087–88, and 093. Neun also has prepared Schiff's zero-income federal tax returns for 1998 through 2001. Henline, Exhibits 3–6.

Defendant Cohen sells Schiff's materials and promotes Schiff's packages and seminars through Freedom Books. *See* Holland Decl., Exhibits 1 and 2. Cohen has also prepared zero-income tax returns based on Schiff's tax-scheme materials. *Id.*

B. *False and fraudulent nature of statements and defendants' knowledge*

Schiff's contention that the imposition of a validly enacted income tax by Congress violates the taxing clauses of the Constitution has been rejected repeatedly by the Supreme Court and the Ninth Circuit Court of Appeals. *See United States v. Sullivan,* 274 U.S. 259, 263–264, 47 S.Ct. 607, 71 L.Ed. 1037 (1927) (defendant's income subject to tax); *Brushaber v. Union Pac. R.R. Co.,* 240 U.S. 1, 19–20, 36 S.Ct. 236, 60 L.Ed. 493 (1916) (the right of Congress to impose income tax cannot be doubted); *Tyee Realty Co. v. Anderson,* 240 U.S. 115, 117–18, 36 S.Ct. 281, 60 L.Ed. 554 (1916) (income tax constitutional); *United States v. Nelson (In re Becraft),* 885 F.2d 547, 548–49 (9th Cir.1989) (imposing sanctions on counsel in criminal appeal for challenging constitutionality of tax codes, holding such challenges "patent[ly] absurd[ ]" and frivolous when "the Supreme Court and the lower federal courts have both implicitly and explicitly recognized the Sixteenth Amendment's authorization of a non-apportioned direct income tax on United States citizens residing in the United States and thus the validity of the federal income tax laws as applied to such citizens"); *Grimes v. Comm'r,* 806 F.2d 1451, 1453 (9th Cir.1986) ("There can be no doubt that the tax on income is constitutional.").

Furthermore, Schiff's claim that paying taxes is voluntary is knowingly false. Schiff, above all, is aware that citizens have a legally enforceable obligation to pay federal income taxes. In 1978, Schiff was convicted of failure to file personal income tax returns for 1974 and 1975. On appeal, Schiff did not challenge the fact that he was required to file a return showing his income; rather he successfully claimed that admission of a videotape of a television talk show was unduly prejudicial to his good faith defense. *See United States v. Schiff,* 612 F.2d 73 (2d Cir.1979). A subsequent conviction for failure to file personal income tax returns for 1974 and 1975 was affirmed without opinion in 1981. *See United States v. Schiff,* 647 F.2d 163 (2d Cir.1981). Schiff's 1985 conviction for attempted tax evasion and willful failure to

file a corporate tax return was affirmed by *United States v. Schiff*, 801 F.2d 108 (2d Cir.1986), *cert. denied*, 480 U.S. 945, 107 S.Ct. 1603, 94 L.Ed.2d 789 (1987). The first three counts of the indictment against Schiff in his 1985 conviction charged that he had "knowingly attempt[ed] to evade and defeat the income tax owed by him for each of the three years in question by failing to make tax returns, failing to pay the income tax he owed and concealing and attempting to conceal his income." *Id.* at 109. "Schiff's defense at trial was that he believed in good faith that *the income tax was voluntary,* and that he was, therefore, not required to pay the tax." *Id.* at 110 (emphasis added). In its opinion affirming Schiff's conviction, the Court of Appeals admonished:

> It is well established that the good faith defense encompasses misunderstanding of the law, not disagreement with the law. The distinction is necessary to the function of the tax system. Without it, any taxpayer could evade tax obligations simply by stubbornly refusing to admit error despite the receipt of any number of authoritative statements of the law. At some point, such stubbornness becomes unreasonable; the line is crossed between misunderstanding and disagreement and the taxpayer can no longer successfully assert a defense of good faith.

*Id.* at 112 (citations omitted).

That Schiff has no misunderstanding of the falsity of the claim that income tax is voluntary is further evidenced by his many losses in civil tax cases. In *Schiff v. United States*, 919 F.2d 830 (2d Cir.1990), *cert. denied*, 501 U.S. 1238, 111 S.Ct. 2871, 115 L.Ed.2d 1037 (1991), the Second Circuit affirmed an appeal from a summary judgment against Schiff in a tax refund case, holding that "Schiff's background makes it inconceivable that he was unaware of his obligation to file returns and pay taxes." *Id.* at 833–34. In that same case, the Second Circuit described Schiff as "an extremist who reserve[s] the right to interpret the decisions of the Supreme Court as he read[s] them from his layman's point of view regardless of and oblivious to the interpretations of the judiciary." *Id.* at 834. The Tax Court, too, has affirmed a fraud penalty and imposed a $25,000 fine on Schiff for offering specious arguments against federal income tax, including the argument that income taxation is not authorized by the taxing clauses of the United States Constitution. *Schiff v. Comm'r*, 63 T.C.M. (CCH) 2572, 1992 WL 66915 (1992).[3]

Furthermore, a number of individuals have been convicted of tax crimes after following Schiff's theories. *See United States v. Burdett*, 962 F.2d 228 (2d Cir. 1992) (affirming conviction of defendant who was convinced in part by Schiff's book entitled *How Anyone Can Stop Paying Taxes* that the filing of a tax return was voluntary, and that his wages were not taxable); *United States v. Payne*, 978 F.2d 1177 (10th Cir.1992) (same), *cert. denied*, 508 U.S. 950, 113 S.Ct. 2441, 124 L.Ed.2d 659 (1993); *United States v. Middleton*, 246 F.3d 825 (6th Cir.2001) (affirming conviction of defendant who followed Schiff's teachings and concluded that he had no obligation to pay income tax); *United States v. Dentice*, 1999 WL 1038003 (9th Cir.1999) (unpublished[4]) (rejecting good

---

**3.** Indeed, Schiff's own counsel's refusal to assert Schiff's tax theories in the hearing on the motion for preliminary injunction should itself have sent a message to Schiff that his tax ideology is legally frivolous. After Schiff's counsel refused to assert Schiff's theories in

court, Schiff dismissed her, and represented himself during the remainder of the hearing.

**4.** This case is cited as evidence of Schiff's knowledge of the reception of his theories in the Ninth Circuit, rather than for the propositions stated in the case.

faith defense in part because defendant could not reasonably rely on Schiff, who was neither a CPA nor an attorney and had himself been convicted of tax evasion).

In *The Federal Mafia*, Schiff acknowledges in a footnote that some people persuaded by him to stop paying income taxes have gone to jail. *The Federal Mafia*, at 167 n. 1. Schiff then warns that by using the information in his book (particularly the means for stopping the withholding of tax), the reader runs the risk of going to jail. Schiff's attempt at a disclaimer, along with the unanimous tide of cases adverse to the legal foundations of his programs, make clear that Schiff is on notice of the law, notwithstanding his remonstrations that he is the one who is right, and that every single legal authority to the contrary is either bogus or unsound.

Furthermore, Schiff's attempt to distinguish the adverse cases on the grounds that they do not specifically involve application of his zero-income tax scheme is totally unavailing. All of Schiff's schemes suffer from the same conceptual infirmities, rejected time and again by the courts: that income taxes are voluntary; that there is no legal obligation to pay income taxes; and that imposition of an income tax by Congress violates the taxing clauses of the Constitution. Only the approaches to avoiding the payment of income tax are different. Schiff cannot avoid the "know or had reason to know" standard by holding up a differently wrapped package. Schiff knows what's in the box, and therefore knows better. *See Estate Preservation*, 202 F.3d at 1103 ("The 'knew or had reason to know' standard therefore includes 'what a reasonable person in the [defendant's] . . . subjective position would have discovered.' ") (citations omitted).

If Schiff's knowing marketing of his tax scheme were not enough, he also falsely and perversely tries to allay his customers' reasonable fears of the civil or criminal consequences for following his tax advice. On Schiff's publicly posted online bulletin board, a customer involved in legal proceedings expressed fear of the loss of her home and prison for following Schiff's counsel. Schiff responded that "[n]o one is going to prison or is even being charged criminally. . . . You need to be studying my material and finding a better confidence level. If you did that, you would not be so afraid!" Cantrell, at 072–074. The deceptive nature of Schiff's scheme is further illustrated by Schiff's suggestions in *The Federal Mafia* that customers cannot be successfully prosecuted for signing W–4 forms falsely claiming exempt status so long as the customers write "under duress" next to their signature on the form. *See The Federal Mafia*, at 158–59. In addition, Schiff markets in *The Federal Mafia* his availability as a witness and brief writer, suggesting falsely that these services will be material in defending a criminal prosecution. *See The Federal Mafia*, at 266.

The government has also established that defendant Neun directly participated in the organization and sale of the tax scheme, furnished false statements, and knew or had reason to know that the statements were false. Neun is Schiff's longtime business partner. She has advised individuals that "[t]he best reliance defense you can get is the attachment to your zero return," and stated that "[n]o one is going to prison or is even being charged criminally." Cantrell, at 066, 072. She endorses false testimonials on the successes of Schiff's zero-income program. Cantrell, at 21–25. And she has helped individuals fill out zero-income tax returns. Henline, at Exhibits 5, 6, 8, 9, 10, 11, 12, 13.

The government has also shown defendant Cohen's direct participation in and knowledge of the falsity of the scheme.

Defendant Cohen is an employee at Freedom Books. On at least one occasion, he assisted an individual in the filing of a zero-income tax return. Henline, at Exhibit 14. Cohen also prepared a zero-income return for an undercover IRS special agent posing as a customer and charged her $50. Cohen did not sign the "return preparer" portion of the return, and told the undercover agent that not attaching Schiff's two-page attachment would make it more difficult for the IRS to detect Schiff's and Cohen's customers. Henline, at Ex. 14 and Irey Decl., paras. 4–8 and Exhibits 1–3.

In sum, the government has shown that defendants knowingly participated in and promoted a tax scheme built on concepts and resulting in conduct that have been rejected by federal courts.[5]

### C. *Materiality*

█ If a particular statement has a substantial impact on the decision-making process or produces a substantial tax benefit to a taxpayer, the matter is properly regarded as "material" within the meaning of § 6700. *United States v. Estate Preservation Services*, 38 F.Supp.2d 846, 855 (E.D.Cal.1998) (citing *United States v. Buttorff*, 761 F.2d 1056, 1059 (5th Cir. 1985)), *aff'd*, 202 F.3d 1093 (9th Cir.2000). It cannot be seriously questioned that defendants' statements are material.

### D. *Likelihood of Future § 6700 Violations*

█ Factors that the court may consider in determining the likelihood of future § 6700 violations, and thus, the need for an injunction, include: (1) the gravity of the harm caused by the offense; (2) the extent of the defendant's participation: (3) the defendant's degree of scienter, (4) the isolated or recurrent nature of the infraction; (5) the defendant's recognition (or nonrecognition) of his own culpability: and (6) the likelihood that defendant's occupation would place him in a position where future violations could be anticipated. *Estate Preservation*, 202 F.3d at 1105.

Here, recurrence of the violations is likely. Schiff organized the scheme, and he and the other defendants have each participated in the sale and promotion of the scheme which has involved over 3,000 individuals and an estimated $56 million in attempted tax evasion; each has done so knowingly and on numerous occasions; each is unapologetic and each is involved directly with the scheme as a matter of employment.

### III. *Violations of § 6701*

█ Under 26 U.S.C. § 6701(a), "[a]ny person who (1) aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return, affidavit, claim or other document, (2) who knows (or has reason to believe) that such portion will be used in connection with any material matter arising under the internal revenue laws, and (3) who knows that such portion (if so used) would result in an understatement of the liability for tax of another person" shall pay a penalty.

As previously discussed, the government has shown by a preponderance of the evidence that Schiff, Neun and Cohen have

---

5. Defendants argue that during the preliminary injunction hearing, the government was bound to show Schiff's witnesses the law that made them liable for income taxes. The legal authority supporting the conclusion that defendants made or caused to be made false or fraudulent statements concerning the tax benefits to be derived from the scheme was presented in the government's briefs. Moreover, legal precedent rejecting the bases for Schiff's scheme are applied by this court whether presented by a party or not. Furthermore, that the government has not brought criminal charges against defendants does not weaken its authority to pursue the civil relief available in this action.

violated § 6701 by preparing false tax returns and other tax-related documents for their customers. These returns and documents falsely report that their customers have no taxable income and no tax liability. Schiff, Neun, and Cohen knew and intended that these documents would be used in connection with material tax matters and result in the understatement of tax liability.

Defendants have failed to refute the government's evidence or raise legal authority contrary to these findings. Therefore, their course of conduct in furtherance of the abusive tax scheme is subject to the preliminary injunction as set forth below.

## IV. First Amendment

The court must consider whether the preliminary injunction violates the First Amendment. Defendants argue that any restriction of their activities or publications amounts to an infringement of speech. The court is cognizant that "[t]emporary restraining orders and permanent injunctions-i.e., court orders that actually forbid speech activities-are classic examples of prior restraints," see Alexander v. United States, 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (.993), and that prior restraints are generally presumed unconstitutional. See New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) ("Any system of prior restraint, however, 'comes to this Court bearing a heavy presumption against its constitutional validity.'"). However, as the Supreme Court has indicated, not all prior restraints are prohibited. See Near v. State of Minnesota ex rel. Olson, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Indeed, numerous federal courts have imposed § 7408 injunctions on similar abusive tax schemes without violating the First Amendment. See Estate Preservation, 202 F.3d 1093; Unit-

ed States v. Raymond, 228 F.3d 804 (7th Cir.2000), cert. denied, 533 U.S. 902, 121 S.Ct. 2242, 150 L.Ed.2d 230 (2001); United States v. Kaun, 827 F.2d 1144 (7th Cir. 1987); United States v. Smith, 657 F.Supp. 646 (W.D.La.1986), aff'd, 814 F.2d 1086 (5th Cir.1987); United States v. White, 769 F.2d 511 (8th Cir.1985); United States v. Buttorff, 761 F.2d 1056, 1066 (5th Cir. 1985); United States v. Bell, 238 F.Supp.2d 696 (M.D.Pa.2003); United States v. Shugarman, 596 F.Supp. 186 (E.D.Va.1984); United States v. Savoie, 594 F.Supp. 678 (W.D.La.1984). See also Nat. Commodity and Barter Ass'n/Nat. Commodity Exch. v. United States, 843 F.Supp. 655 (D.Colo.1993) (dismissing suit raising First Amendment challenge to § 6700 penalty), aff'd, 42 F.3d 1406 (10th Cir.1994), cert. denied, 516 U.S. 807, 116 S.Ct. 52, 133 L.Ed.2d 17 (1995); Bell v. Rossotti, 227 F.Supp.2d 315 (M.D.Pa.2002) (dismissing complaint seeking declaratory judgment that websites on tax law were protected by the First Amendment).

■ As the court has previously explained, defendants knowingly promote and participate in an abusive tax scheme that teaches taxpayers that they may lawfully file zero-income tax returns and exempt withholding statements to avoid paying taxes, and assists them in doing so. This message is subject to injunction as false, misleading and deceptive commercial speech, incitement, and aiding and abetting illegal conduct as discussed below.

### A. Commercial Speech

■ Commercial and noncommercial speech are protected under the First Amendment; however, the Constitution accords less protection to commercial speech than other protected forms of expression. S.O.C., Inc. v. County of Clark, 152 F.3d 1136, 1142 (9th Cir.) (citing Cen-

*tral Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)), *amended,* 160 F.3d 541 (1998).[6] The Supreme Court has acknowledged that the "precise bounds" of commercial speech are "subject to doubt," *Zauderer v. Supreme Court of Ohio,* 471 U.S. 626, 637, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), and has candidly recognized "the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 419, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). Not unexpectedly, therefore, the Court has defined commercial speech in two ways. "Core" commercial speech is an expression that "does no more than propose a commercial transaction." *See Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Core commercial speech includes "advertising pure and simple." *Zauderer,* 471 U.S. at 637, 105 S.Ct. 2265. The other definition of commercial speech is somewhat broader: "[E]xpression[s] related solely to the economic interests of the speaker and its audience." *Central Hudson,* 447 U.S. at 561, 100 S.Ct. 2343.

### 1. Commercial Speech Aspects of the Scheme

In ruling that abusive tax schemes may be enjoined to the extent that the injunction "proscribes ... fraudulent conduct," 202 F.3d at 1106, the Ninth Circuit explained in *Estate Preservation* that "a promoter's statements regarding the tax benefits of his [abusive tax schemes]" constitute commercial speech. 202 F.3d at 1106 (quoting *Buttorff,* 761 F.2d at 1066). The *Estate Preservation* court affirmed an injunction that reached "the organizing, promoting, marketing, or selling," of the scheme. 202 F.3d at 1096 n. 3.[7]

As previously discussed, Schiff's enterprise advertises and sells books, tapes and other products over the internet, and through Freedom Books, his store in Las Vegas, Nevada, and other avenues to promote his scheme. Schiff also advertises and markets seminars and workshops to instruct attendees on how anyone can implement his formulas for avoiding payment of income taxes. As part of the scheme, Schiff offers for sale letter-writing services and "personal consults." He also holds himself out as a "tax consultant," with experience and background in fields related to taxation.

---

**6.** There is no dispute that while the First Amendment protects commercial speech generally, it does not protect false commercial speech. *See 44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 497 n. 7, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) ("The First Amendment does not protect commercial speech about unlawful activities."); *Central Hudson,* 447 U.S. at 562–63, 100 S.Ct. 2343 ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it."); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771–72 n. 24, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ("Untruthful speech, commercial or other-

wise, has never been protected for its own sake.... The First Amendment ... does not prohibit the State from ensuring that the stream of commercial information flow[s] cleanly as well as freely.").

**7.** The importance of *Estate Preservation* to this court's First Amendment analysis cannot be overstated. That case is the only Ninth Circuit precedent addressing a First Amendment challenge to a § 7408 injunction based on § 6700 violations. The ACLU's attempt to distinguish *Estate Preservation* because it involves the marketing of abusive tax trusts is off the mark. The schemes involved in *Estate Preservation* and the instant case share a common purpose, to avoid taxes, a common liability under § 6700, and common First Amendment considerations.

Definitely, the portions of the scheme that would be considered "core" commercial speech, i.e., that speech which proposes no more than a commercial transaction, may be enjoined if they are deceptive or misleading. Such advertising of the scheme would include statements or suggestions that (1) persons can legally stop paying taxes, or become tax free through the use of the scheme, (2) income tax is voluntary, or that there is no law requiring anyone to pay income tax, (3) there is no income tax, only a profits tax, (4) it is legal to report zero income regardless of what you may have earned, and (5) it is legal to stop the withholding of taxes by submitting an "exempt" W–4 form.

The extent to which commercial speech reaches beyond "core" commercia speech, and includes the broader category of "expression related solely to the economic interests of the speaker and its audience," is illustrated by the Ninth Circuit's decision in *Estate Preservation*. In that case, the court affirmed a § 7408 preliminary injunction against the organizers and promoters of Estate Preservation Services ("EPS"), for violation of § 6700 in the marketing of trusts and other asset protection devices, including certain irrevocable non-grantor trusts called "Asset Preservation Trusts" or "APTs". 202 F.3d at 1097. Henkell, the central figure in promoting and organizing the activities of EPS, established and conducted seminars during which he advised individuals how to create and use APT's to generate tax deductions and reduce tax liability. To market the APTs, Henkell published a training manual. The manual "made numerous representations about the permissibility of tax deductions and credits purportedly available to APTs." *Id.*

The district court found that the manual, materials and representations by defendants contained fraudulent statements regarding the use of the trusts,[8] and enjoined defendants from "organizing, selling, or assisting in the organization of an entity or otherwise promoting any plan or arrangement based upon" these statements. The preliminary injunction also prohibited defendants from "organizing, promoting, marketing, or selling [the trusts], and any abusive tax shelter, plan, or arrangement which advises or encourages taxpayers to attempt to violate internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities." *Id.* at 1096 n. 3.

The *Estate Preservation* court rejected a First Amendment challenge to the injunction, holding that it "prescribes only fraudulent conduct." *Id.* at 1106. In so doing, the court observed that other courts have upheld similar injunctions in spite of First Amendment challenges, quoting *Buttorff,* 761 F.2d at 1066 (emphasis added):

> [W]here it has been determined that [a promoter's] statements regarding the tax benefits of his trust, *which constitute commercial speech,* are misleading in the context contemplated by Congress in enacting the statute, and the injunction prohibiting such statements is adequately tailored and construed to enjoin only *such commercial speech* which has been shown to be both misleading and likely to promote illegal activity, such representations are not protected by the First Amendment.

*Buttorff,* and the two other cases cited by the *Estate Preservation* court, *United States v. Kaun,* 827 F.2d 1144 (7th Cir. 1987), and *United States v. White,* 769

---

**8.** The fraudulent statements concerned (1) the basis of property placed in trust; (2) the strategy of "upstreaming" income; (3) the deductibility of personal expenses and the deprecia-tion of an owner-occupied home; and (4) the deductibility of certain donations to donor-directed charitable foundations. *Estate Preservation,* at 1099.

F.2d 511 (8th Cir.1985), each applied a broader definition of commercial speech than "advertising, plain and simple." *Buttorff* involved a kit of trust forms that was marketed with the scheme and included a declaration, introductory materials, and step-by step instructions for creating and maintaining the trust. The promoter of the plan also participated in setting up the trusts and provided for the preparation of his customers' income tax returns. 761 F.2d at 1057 n. 1. The commercial speech in *Buttorff* reached "[a]ppellant's representations regarding the tax advantages of his trust." *Id.* at 1066.

In *Kaun,* the Seventh Circuit affirmed the injunction against a tax protest group that promoted false plans to avoid the payment of taxes. Forms, pamphlets and information kits were sold at the protest group's meetings. The *Kaun* court applied the *Central Hudson* definition of commercial speech, "expression related solely to the economic interest of the speaker and its evidence," to reach not only advertising, but "marketing, or selling any documents or other information advising taxpayers that wages, salaries, or other income . . . are not taxable." 827 F.2d at 1152.

In *White,* the Eighth Circuit affirmed an injunction against a group that marketed to the public a packet of materials consisting of a cassette tape and written materials (including sample federal income tax forms). The materials contained "detailed instructions about false or fraudulent means to evade federal income taxes, especially as applied to the taxation of wages, salaries or other compensation for labor or services." 769 F.2d at 512. In addition to the packets of materials, the group "orally instructed individuals and offered for sale materials on how to harass and impede employees of the Internal Revenue Service (IRS)." *Id.*

In its First Amendment analysis, the *White* court applied the broader definition of commercial speech:

> Appellant next argues that the injunction constitutes an impermissible prior restraint in violation of the first amendment. We disagree. Appellant's representations were made in connection with his efforts to promote and sell for profit [the plan] and thus constitute commercial speech. . . .
>
> . . .
>
> The commercial speech in question in the present case, appellant's representations regarding the allowability of deductions, the excludability of income and the tax benefits of the [plan], was not only completely misleading, but it also promoted tax evasion and abusive tax avoidance.

769 F.2d at 516, 517. The court went on to state that such misleading advertising may be prohibited entirely because "the first amendment does not protect commercial speech which promotes an illegal activity or transaction." *Id.*

Thus, *Estate Preservation,* read in the context of its supporting case law, and in light of the reach of the injunction it approved (prohibiting the "promoting, marketing or selling" of the abusive tax shelter), must be taken to apply a definition of commercial speech broader than "core" commercial speech.[9]

In approving the broad terms of the injunction, the *Estate Preservation* court also took into account that the promoters, all of whom were well-educated and familiar with tax matters, were essentially selling fraudulent tax advice through the scheme. 202 F.3d at 1097, 1103. Along these lines, the *Estate Preservation* court made a point of emphasizing that:

**9.** In fact, the term "advertising" is not found in the *Estate Preservation* injunction.

Appellants may continue to publish legitimate tax planning advice, even regarding trusts. They are simply prohibited from advocating shelters that provide no legitimate shelter from lawful taxation. Every honest and qualified tax consultant knows the difference between legitimate and plainly illegitimate tax shelters. Appellants crossed the line into the "plainly illegitimate".

*Id.* at 1106. Given this context, the court determined that the injunction "proscribes only fraudulent conduct." *Id.*

Similarly, the *Buttorff* and *Kaun* cases cited by *Estate Preservation* in its First Amendment analysis also give weight to the tax-advice context of the prohibited speech. In agreeing that the promoter of the tax scheme was engaged in commercial speech, the *Buttorff* court explained:

> The statements [appellant] has made concerning the purported tax benefits of [the scheme] were made in an effort to promote and sell the packaged trust forms and his personal services in connection therewith, all for profit. The United States Supreme Court has summarized the commercial speech doctrine in the context of advertising for professional services: "Truthful advertising related to lawful activities is entitled to the protections of the First Amendment." But when the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the

States may impose appropriate restrictions. Misleading advertising may be prohibited entirely.

761 F.2d at 1066. And in *Kaun,* the court ruled that "[i]nsofar as Kaun holds himself out as a tax adviser, his advertising and marketing activities in that regard [i.e., within the *Central Hudson* definition] are commercial speech." 827 F.2d at 1152. *See also Raymond,* 228 F.3d at 815 (false, deceptive or misleading commercial speech related to the provision of tax advice may be prohibited); *Smith,* 657 F.Supp. at 659 (banning manual promoting personal services through commercial speech).

Accordingly, the court follows *Estate Preservation* in applying a commercial speech standard to expression involved in not only the advertising, but also the promoting, marketing or selling of the scheme. Furthermore, following *Estate Preservation,* the court finds that to the extent Schiff holds himself out to be a tax consultant, familiar with the taxing system, and experienced in tax-related fields, the promotion, marketing and sales of the scheme involves the offering of fraudulent tax advice, and is not protected by the First Amendment.[10]

## 2. *The Federal Mafia*

The American Civil Liberties Union of Nevada, in amicus curiae (hereafter the "ACLU"),[11] while taking no position on the merits of the tax plan,[12] argues that a ban on the sale of the book *The Federal Mafia*

---

**10.** Indeed, as previously discussed, defendants' sophistication and education in tax matters meets the scienter requirement of a § 6700 violation.

**11.** The ACLU is joined in its briefs by the Association of American Publishers, Inc., the American Booksellers Foundation for Free Expression, the Freedom to Read Foundation of the American Library Association, and the PEN American Center.

**12.** The ACLU stakes out its position with respect to the scheme in these words "[W]e take no position on the truth or falsity of any of Mr. Schiff's theories;" the scheme is "beyond the scope of our concerns;" and "[*The Federal Mafia* ] contains significant political discourse. At least that is Mr. Schiff's contention."

would amount to an impermissible prior restraint. According to the ACLU, *The Federal Mafia* cannot be characterized as commercial speech because (1) it does not fit the definition of commercial speech as proposing no more than a commercial transaction, (2) it is sold in bookstores and through the Internet independent of the tax scheme, and (3) it is not promoted through paid memberships involving face-to-face communication. Thus, the ACLU urges that the court must apply the more stringent *Brandenburg* incitement standard before subjecting the book to the preliminary injunction.

The court first considers whether the book qualifies as commercial speech. The ACLU argues that the Supreme Court and the Ninth Circuit have recently applied the "core" notion of commercial speech, and that the definition of expression that "does no more than propose a commercial transaction" should be used to characterize *The Federal Mafia*. Even if the court applies just the "core" definition, however, the book contains "advertising pure and simple." *The Federal Mafia* includes not only a description of a number of other books written and published by Schiff, but also a description of a cassette seminar and audio reports, and their prices. *The Federal Mafia*, at 303–04. The advertisement for the cassette seminar declares that the seminar contains highlights from *The Federal Mafia*, and promises that "[i]f you are happy with The Federal Mafia, you will be thoroughly delighted with this 5½ hour cassette seminar." As previously indicated, one "highlight" of *The Federal Mafia* is its reference to instructions and materials to be used in submitting false withholding forms and zero-income tax returns. Among the audio reports advertised in the book are those that promise to "deliver explosive new information to enable us to neutralize and frustrate IRS procedures in practically every situation," and provide a document "that will allow you to blow away all IRS claims that you owe them any money whatsoever for income taxes."

The ACLU also suggests that *The Federal Mafia* "does no more than propose a commercial transaction" because it contains autobiographical and political expression. However, commenting on public issues in the context of a commercial transaction does not elevate speech from commercial to political rank. *See Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 68, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) ("[A]dvertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech.") (citing *Central Hudson*, 447 U.S. at 563 n. 5, 100 S.Ct. 2343); *Zauderer*, 471 U.S. at 637 n. 7, 105 S.Ct. 2265. (same).

Furthermore, the commercial speech components of *The Federal Mafia* are not "inextricably intertwined" with its protected expression. *See Discovery Network*, 507 U.S. at 426 n. 21, 113 S.Ct. 1505; *Bd. of Trustees of the State Univ. of New York v. Fox*, 492 U.S. 469, 474–75, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) ("No law of man or nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares."). Likewise, "no law of man or nature makes it impossible" for Schiff to publish his ideology or comment on matters of public concern without advertising his tax scheme or the products related to the scheme. The commercial speech found in *The Federal Mafia* does not help finance the publication of the book, as outside advertising often finances publications. Rather, the advertising in *The Federal Mafia* markets other Schiff products, materials and services, many of which are related to the tax scheme. Therefore, even under the narrow "core" definition of commercial speech, the false,

misleading or deceptive elements of that speech would be enjoinable.

Significantly, however, as previously discussed, the injunction in *Estate Preservation* reaches beyond "advertising" to include the "promoting, marketing or selling" of the scheme. In considering the promotional, marketing and sales methods used in the scheme, the *Estate Preservation* court found a nexus between the training manual and the marketing of the tax scheme. 202 F.3d at 1097. The court did not address whether the manual contained specific advertising for the scheme, but held that it "made numerous representations about the permissibility of tax deductions and credits purportedly available to [the trusts]." *Id.* In similar fashion, portions of *The Federal Mafia* are linked to the marketing of Schiff's tax scheme. The tax scheme's promotions identify the book as the starting point of the program, and represent that "[i]t shows you how to file the zero return, stop your wage withholding, and explains the basics." Cantrell, at 062. Other advertising for the book states that it "provides the information and documents required to immediately stop your wage withholding, and to file a request for a refund of all the taxes you paid." Cantrell, at 018. *The Federal Mafia* is marketed as part of almost all of Schiff's instructional packages. Consistent with *Estate Preservation,* therefore, *The Federal Mafia*'s commercial speech nature includes the training-manual characteristics of the book (including instructions and materials regarding the false filings of zero returns and submissions of W–4s) that further the promotion, marketing and sales of the overall tax scheme.

The court has further support for applying a commercial speech definition reaching the "promoting, marketing, or selling" of the scheme from the Fifth Circuit. In *United States v. Smith,* 657 F.Supp. 646 (W.D.La.1986), *aff'd,* 814 F.2d 1086 (5th Cir.1987), the Fifth Circuit affirmed an injunction on the basis of the district court opinion which prohibited the marketing and sale of a manual (including forms and instructions) authored and published by defendant on how to establish unlawful trusts, along with various services to customers. The district court determined that defendant's First Amendment rights were fully protected so long as the injunction did not "proscribe all commercial speech, but [was] limited to specific representations concerning tax benefits which are misleading." 657 F.Supp. at 658. The *Smith* court observed that in *Buttorff,* 761 F.2d at 1066 (the case quoted in *Estate Preservation* ), a First Amendment challenge was rejected "because Buttorff's representations concerning purported tax benefits were made in an effort to promote and sell certain packaged trust forms and personal services, all for profit to Buttorff." 657 F.Supp. at 658. Likewise, those representations in *The Federal Mafia* which promote the use of the tax scheme for profit to Schiff are commercial speech not shielded by the First Amendment.

The ACLU next argues that the cases cited by the government in which printed materials are banned involve only marketing of the materials in face-to-face contacts or through paid memberships; whereas *The Federal Mafia* is sold independently in bookstores or online to the public and is neither a direct part of the scheme nor marketing for it. According to the ACLU, Schiff's marketing of *The Federal Mafia* through impersonal channels in which it can stand alone from the scheme sets it apart from the schemes in other cases. This distinction, however, is unsound.

*The Federal Mafia,* while being marketed openly to the public through Freedom Books bookstore and online, is also adver-

tised and sold in Schiff's live and taped seminars and instructional packages as "the starting point" for the scheme. Far from containing merely commentary, information and expression of opinion regarding the legitimacy of the tax system, the book is, in part, a how-to manual directed to specific individuals seeking instructions, sample forms, and attachable affidavits to be used in the filing of false income tax returns and submission of false W–4s. Morever, the information refers the reader to other materials, seminars and personal assistance to achieve that end. The book does not provide information or advocacy on tax reform in general, and then leave the reader to act on his own judgment, or consider the advice of legitimate tax professionals before engaging in conduct of legal significance. Rather, it is part of the effort to sell for profit Schiff's materials and services. In this regard, *The Federal Mafia* hardly stands alone, but by its very essence is closely connected to the scheme expressly and financially. *See Smith,* 657 F.Supp. at 658 (discussing *Buttorff* ).

Nor is the court persuaded by the ACLU's argument that *Estate Preservation* and other § 7408 cases cited by the government involve the marketing of materials only in face-to-face or membership contexts. In *Estate Preservation,* the promoter published the training manual to market the trusts, and also conducted seminars where he advised customers. In *White,* the scheme included both the sale of packets of materials, and separate meetings where the group instructed individuals on harassment techniques. *See also United States v. Barnett,* 667 F.2d 835 (9th Cir.1982) (rejecting First Amendment challenge to conviction involving drug manufacturing instructions mailed to countless customers with whom defendant had no personal contact); *Buttorff,* 572 F.2d at 622–23 (affirming, despite First Amendment challenges, convictions for providing tax-evasion information at "large

public gatherings" to participants whom the defendants did not personally meet); *Smith,* 657 F.Supp. at 649–50 (manual marketed separately from other aspects of program).

The ACLU also overstates its claim that the government has cited only cases involving materials that are exclusively part of the scheme, rather than containing a combination of protected and unprotected speech. In *Estate Preservation,* the court affirmed a ban on the distribution of the training manual even though the district court found only four of numerous representations contained false statements about the trusts' tax benefits. 202 F.3d at 1099; *United States v. Estate Preservation Serv.,* 38 F.Supp.2d 846, 851 (E.D.Cal. 1998). *See also Raymond,* 228 F.3d 804 (rejecting First Amendment challenge as it related to injunction on the marketing or sale of a three-volume set of materials which included both information regarding general tax-protest principles, and forms and instructions to guide the purchaser through submission of W–4 forms claiming exempt status, the filing of IRS refunds requests for prior years, and the filing of tax returns to reflect no income tax liability); *Smith,* 657 F.Supp. at 649 (manual "reviews the characteristics and prescribes the means to create various types of trusts, to include the family preservation trust").

Finally, to the extent that the contents of *The Federal Mafia* identify Schiff as a tax consultant, publicize his tax-related background and qualifications, and promote, market or sell his advice, the book falls within the fraudulent tax-advice standard of *Estate Preservation.* Based on these considerations, the court finds that the commercial speech and tax advice aspects of the scheme (including those contained in *The Federal Mafia* ) can be en-

joined to the extent that they are false, misleading or deceptive.

### B. *Incitement*

■■■■ It is well-settled that the First Amendment protects an individual's right to disagree with the law and to advocate the violation of a law. *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). There is no protection, however, for speech or advocacy that is directed toward producing imminent lawless action. *Id.* (The government may forbid advocacy of law violation "where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."). Moreover, "[t]he mere abstract teaching of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." *Id.* at 448, 89 S.Ct. 1827. The court finds that defendants have gone beyond permissible advocacy by instructing others in a way that is "directed to inciting or producing imminent lawless action."

The stated purpose of Schiff's scheme is to advise purchasers about how to "legally stop paying taxes." As discussed previously, however, Schiff's scheme is anything but legal. Through live and recorded seminars, materials, and personal assistance, Schiff and his co-defendants show their customers how to file false tax returns and withholding statements. Schiff supplies his customers with sample forms or fill-in-the-blank forms to be used in the filings. For instance, Schiff's materials include sample "zero returns" and advise that they be filed "only by attaching to it our two-page attachment" Schiff's encouragement of customers that "income tax is voluntary," and his assurances that "[f]or income tax purposes, you can legally report 'zero' income and pay no income taxes regardless of how much you might have earned," or that customers can "legally stop paying taxes," using his program, in combination with the direct facilitation of filing false returns and exempt withholding forms, moves Schiff's form of advocacy into the realm of incitement. *See Kaun*, 827 F.2d at 1151 (tax group "may not incite other [members] or would-be members to understate their tax liability or avoid paying taxes by means of the false and frivolous theories ...".); *Raymond*, 228 F.3d at 815; *United States v. Kelley*, 769 F.2d 215, 217 (4th Cir.1985) (no First Amendment protection for telling listeners "what to do and how to prepare the [tax] forms" and supplying them with [tax] forms and materials, even though seminars were dedicated to the belief "that the federal income tax is unconstitutional as applied to wages.... It was no theoretical discussion of noncompliance with laws; action was urged; the advice was heeded, and false [tax] forms were filed"); *United States v. Buttorff*, 572 F.2d 619, 624 (8th Cir.) (affirming criminal conviction for aiding and abetting others to violate tax laws; defendants' speech incited several individuals to undertake imminent lawless action), *cert. denied*, 437 U.S. 906, 98 S.Ct. 3095, 57 L.Ed.2d 1136 (1978); *Nat. Commodity and Barter Ass'n/Nat. Commodity Exch. v. United States*, 843 F.Supp. 655 (D.Colo. 1993) ("[T]he NCBA went beyond advocating nonpayment of taxes in general."), *aff'd*, 42 F.3d 1406 (10th Cir.1994), *cert. denied*, 516 U.S. 807, 116 S.Ct. 52, 133 L.Ed.2d 17 (1995).

Furthermore, the government has presented evidence that Schiff's tax scheme actually persuaded others to violate the law. The IRS identified nearly 5,000 zero-income federal income tax returns filed by some 3,100 customers of Schiff's organization during the past three years using Schiff's two-page attachment referenced in *The Federal Mafia*, supplied with its purchase, and identified by promotional materials as a requirement to the filing of the

zero-income tax return tutored by *The Federal Mafia* and other of Schiff's instructional services. If that circumstantial connection were not enough, Schiff's own witness at the preliminary injunction hearing testified that he obtained the zero-income return that he filed from *The Federal Mafia*. *See Kaun*, 827 F.2d at 1151 n. 3 (no need to address whether injunction reached mere advocacy of non-payment of taxes "because [defendant's] activities did in fact lead to lawless action").

■ The ACLU suggests that *The Federal Mafia*, standing alone and sold to the public separately from other Schiff's services and products, is too removed to pose a risk of incitement to imminent unlawful conduct. First of all, as previously discussed in section III.A., speech is not insulated by the First Amendment merely because it is impersonally disseminated to a wide audience. Morever, in this case, because of the interrelated nature of the book and other ongoing aspects of the scheme, a *Brandenburg* analysis of the book in isolation would be rather unrealistic. *The Federal Mafia* incorporates the scheme. It contains all of the instructions, sample forms and attachments necessary for the filing of the false tax forms. According to Schiff, it "provides the information and documents required to immediately stop your wage withholding, and to file a request for a refund of all the taxes you paid," and "shows you how to file the zero return, stop your wage withholding, and explains the basics." Those portions of *The Federal Mafia* are inherently linked to the scheme's design and purpose and are centrally intertwined with and instrumental in the overall scheme. *See United States v. Mendelsohn*, 896 F.2d 1183, 1186 (9th Cir.1990) (defendants disseminated a computer program that assisted others to record and analyze bets on sporting events; program was "too instrumental in and intertwined with the performance of criminal activity to retain first amendment

protection"). Thus, the book retains its intrinsic relationship to the scheme whether it is packaged or marketed with or without other Schiff products or services.

But the government's showing of imminence stemming from a reading of *The Federal Mafia* goes even further. The government's evidence includes Schiff's advertising containing various testimonials of individuals who claim to have avoided paying taxes by using nothing more than *The Federal Mafia*. Cantrell, at 029, 030, 031, and 035–036. Morever, while the government may not have shown that any particular one of the 3,000 taxpayers to have filed zero-income returns used *The Federal Mafia*, exclusively, a strong inference of that conclusion can be drawn from the exactness of the over 5,000 forms filed and those furnished in or through the book. *See White*, 769 F.2d at 512 ("The government had presented evidence of at least fifteen federal income tax returns for the 1982 calendar year filed in the St. Paul district which appeared to be based upon [the plan]."). This inference is further strengthened by Schiff's marketing of the book. In Schiff's internet advertising, he identifies *The Federal Mafia* as necessary to "show[ ] you how to file the zero return, stop your wage withholding, and explain[ ] the basics," while referring to the seminars as recommended: "It's good for you to get a Seminar, either live, cassette, or on video." Cantrell, at 062. Simply put, Schiff, by the very words used to promote his wares, settles the question of the imminence of unlawful action induced by *The Federal Mafia*.

Therefore, the injunction will proscribe speech that incites others to violate the tax laws, including the evasion of assessment and payment of taxes.

### C. *Illegal Conduct*

■ The First Amendment does not protect conduct which uses speech as part

of a criminal transaction. *See United States v. Mendelsohn*, 896 F.2d 1183, 1186 (9th Cir.1990) (holding *Brandenburg* inapplicable to a conviction for conspiring to transport and aiding and abetting the interstate transportation of wagering paraphernalia). The Fourth Circuit has elaborated:

> [T]he law is now well established that the First Amendment and *Brandenburg*'s "imminence" requirement in particular, generally poses little obstacle to the punishment of speech that constitutes criminal aiding and abetting, because "culpability in such cases is premised, not on defendants' 'advocacy' of criminal conduct, but on defendants' successful efforts to assist others by detailing to them the means of accomplishing the crimes."

*Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 246 (4th Cir.1997) [13] (quoting Department of Justice, "Report on the Availability of Bomb–Making Information, the Extent to Which Its Dissemination is Controlled by Federal Law, and the Extent to Which Such Dissemination May Be Subject to Regulation Consistent with the First Amendment to the Constitution 37" (April 1997)), *cert. denied*, 523 U.S. 1074, 118 S.Ct. 1515, 140 L.Ed.2d 668 (1998). *See also* Laurence H. Tribe, *American Constitutional Law* 837 (2d ed. 1988) ("[T]he law need not treat differently the crime of one man who sells a bomb to terrorists and that of another who publishes an instructional manual for terrorists on how to build their own bombs out of old Volkswagen parts."); Greenawalt, *Speech, Crime, and the Uses of Language* 85 (1989) ("[T]he justifications for free speech that apply to speakers do not reach communications that are simply means to get a crime successfully

committed."); *United States v. Varani*, 435 F.2d 758, 762 (6th Cir.1970) ("[S]peech is not protected by the First Amendment when it is the very vehicle of the crime itself.").

In *United States v. Barnett*, 667 F.2d 835, 842 (9th Cir.1982), the defendant argued that he was immune, under the First Amendment, from search for evidence of the sale of printed instructions for the manufacture of an illegal substance. The court derided, as a "specious syllogism" with "no support in the law" the defendant's argument that the First Amendment protects the sale of the instruction manual simply because the First Amendment protects the written word. *Id.* at 842. In holding that the First Amendment does not provide a defense to the use of printed speech in encouraging and counseling others in the commission of a crime, the *Barnett* court cited the language of *Buttorff*, 572 F.2d 619, in which defendants were convicted of aiding and abetting persons who filed false or fraudulent tax returns after hearing defendants address a public meeting about ways to avoid payment of taxes, including submitting false exemption forms to stop allowances:

> Although the speeches here do not incite the type of imminent lawless activity referred to criminal syndicalism cases, the defendants did go beyond mere advocacy of tax reform. They explained how to avoid withholding and their speeches and explanations incited several individuals to activity that violated federal law and had the potential of substantially hindering the administration of the revenue. This speech is not entitled to first amendment protection, and, as discussed above, was sufficient action to constitute aiding and abetting

---

**13.** Put another way, *Brandenburg* may be relevant only if the act of selling information could be prosecuted regardless of whether there was proof that anyone used the information.

the filing of false or fraudulent withholding forms.

576 F.2d at 624.

Likewise, in *United States v. Freeman,* 761 F.2d 549 (9th Cir.1982), *cert. denied,* 476 U.S. 1120, 106 S.Ct. 1982, 90 L.Ed.2d 664 (1986), the Ninth Circuit concluded that the defendant could be held criminally liable for counseling tax evasion at seminars held in protest of the tax laws, even though the speech that served as the predicate for the conviction "spr[ang] from the anterior motive to effect political or social change." *Id.* at 551. The defendant claimed that he did nothing more than advocate tax noncompliance as an abstract idea, or at most as a remote act, and that the First Amendment therefore barred his prosecution. *Id.* at 552. The court noted, however, that "[t]here was ... substantial evidence of Freeman's use of words of incitement quite proximate to the crime of filing false returns, words both intended and likely to produce an imminent criminal act." *Id.* at 552. The court further rejected defendant's argument that the legality of the transaction he proposed was unsettled, and therefore, the likelihood of an imminent violation could not be established: "[T]he falsity of the returns prepared under Freeman's instructions and the concomitant illegality of their filing are manifest." *Id.*[14]

*Barnett* and *Freeman* were relied on heavily by the Fourth Circuit in *Rice,* 128 F.3d 233. In that case, the court ruled that a "hit man" instruction book was not entitled to protection under the First Amendment's free speech clause as abstract advocacy. *Id.* at 243 ("[W]hile even speech advocating lawlessness has long enjoyed protections under the First Amendment, it is equally well established that speech which, in its effect, is tantamount to legitimately proscribable non-expressive conduct may itself be legitimately proscribed."). That book methodically and comprehensively prepared and steeled its audience to specific criminal conduct through detailed instructions on the commission of criminal conduct. *Id.* at 263–65.

▓ Not unforeseeably, other circuits have recognized that the First Amendment does not shield criminal conduct in tax schemes which take, in whole or in part, the form of speech. *See United States v. Fleschner,* 98 F.3d 155, 158–59 (4th Cir. 1996) (defendants who instructed and advised meeting attendees to file unlawful tax returns were not entitled to First Amendment jury instruction because "[t]he defendants' words and acts were not remote from the commission of the criminal acts."), *cert. denied,* 521 U.S. 1106, 117 S.Ct. 2484, 138 L.Ed.2d 992 (1997); *Kelley,* 769 F.2d at 217 (no First Amendment protection for telling listeners "what to do and how to prepare the [tax] forms" and supplying them with [tax] forms and materials, even though seminars were dedicated to the belief "that the federal income tax is unconstitutional as applied to wages.... It was no theoretical discussion of non-compliance with laws; action was urged; the advice was heeded, and false [tax] forms were filed"); *United States v. Moss,* 604 F.2d 569, 571 (8th Cir.1979) (First Amend-

---

14. On the defendant's entitlement to free speech jury instructions, the court held that a First Amendment instruction was required only for those counts in which there was evidence that the speaker "directed his comments at the unfairness of the tax laws generally, without soliciting or counseling a violation of the law in an immediate sense [and] made statements that, at least arguably, were of abstract generality, remote from advice to commit a specific criminal act." 761 F.2d at 551–52. As to those counts which the defendant, through his speech, directly assisted in the preparation and review of false tax returns, the court held that the defendant was not entitled to a First Amendment instruction at all. *Id.*

ment does not protect defendant's speech in which he challenged constitutionality of federal income tax laws and described how to avoid the federal withholding tax, where, motivated by defendant's speech, employees filed falsified W–4 forms and were prosecuted for violating statute pertaining to fraudulent withholding exemption certificate), *cert. denied,* 444 U.S. 1071, 100 S.Ct. 1014, 62 L.Ed.2d 752 (1980).

 In this case, the government has presented evidence showing that the scheme's stated purpose was, in part, to assist in the commission of a crime, even though the promoters may disagree that such assistance is criminal.[15] The government has also shown that the scheme was targeted toward, and reached, individuals who actually employed it to file false zero income tax returns and falsely claim exempt withholding status. Therefore, to the extent that the injunction proscribes such conduct by organizers, promoters and marketers of the scheme, the First Amendment is not a barrier.

## V. *Conclusion*

Based on the above, the court finds that a § 7408 preliminary injunction can be fashioned in a way that is not an impermissible prior restraint on defendants' protected speech.

The first paragraph of the preliminary injunction is generally patterned on the first paragraph of the injunction approved in *Estate Preservation.* The second and third paragraphs enjoin activities subject to penalty under 26 U.S.C. §§ 6700 and 6701, and incorporate the language of those statutes. The fourth paragraph reaches advertising and marketing of false or misleading tax positions, and is generally patterned after portions of injunctions

affirmed in *Kaun,* and *White.* The fifth paragraph prohibits aiding and abetting, and the sixth paragraph proscribes incitement to imminent unlawful conduct. The seventh paragraph prevents instructing or assisting others to interfere with the administration and enforcement of the internal revenue laws. The eight paragraph is authorized under § 7407. Paragraphs nine, ten and eleven enjoin conduct subject to penalty or injunction under statute.

In drawing up the preliminary injunction, the court is cautious not to limit defendants' legitimate tax-related activities or advocacy.

## VI ORDER OF PRELIMINARY INJUNCTION

Based on the foregoing factual findings and legal conclusions, the court ORDERS that defendants Irwin Schiff, Cynthia Neun, and Lawrence N. Cohen, individually and all doing business as Freedom Books, *www.paynoincometax.com,* and *www.ischiff.come,* and any similar entities, and their agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this Order are enjoined, pending the final disposition of this matter, from:

(1) Organizing, promoting, marketing or selling, or assisting in organizing, promoting, marketing or selling, any plan or arrangement which advises or encourages taxpayers to attempt to violate internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities, including those that promote, sell, or advocate the use of the "zero income" tax return, and the use of false withholding forms;

---

**15.** Of course, this is not equivalent to proving beyond a reasonable doubt that Schiff is guilty of a criminal offense. Any such determination would have to be made in the context of a criminal proceeding.

(2) Engaging in conduct subject to penalty under 26 U.S.C. § 6700, including organizing or selling a plan or arrangement and making or furnishing a statement regarding the excludability of income that they know or have reason to know is false or fraudulent as to any material matter;

(3) Engaging in conduct subject to penalty under 26 U.S.C. § 6701, including preparing an/or assisting in the preparation of a document related to a matter material to the internal revenue laws that they know (or have reason to believe) will result in an understatement of tax liability;

(4) Advertising, marketing, or promoting any false, misleading or deceptive tax position in any media for the purpose of advising or encouraging taxpayers to unlawfully evade the assessment or payment of federal income taxes, including the positions that (1) persons can legally stop paying taxes or become tax free by using the plan or arrangement; (2) federal income tax is voluntary; (3) there is no law requiring anyone to pay income tax; (4) there is no income tax, only a profits tax; (5) it is legal to report zero income regardless of what you may have earned, or to use false withholding forms; (6) Schiff's personal services as witness or brief writer will be materially helpful in defending criminal prosecution; or any other any other false, misleading or deceptive tax position;

(5) Assisting others to violate the tax laws, including the evasion of assessment or payment of taxes, through any means, including selling services, books or other materials that provide direction about how to fill out fraudulent or false tax forms or other tax documents to be filed with the IRS or other entities;

(6) Inciting others to violate the tax laws, including the evasion of assessment and payment of taxes;

(7) Instructing or assisting others to hinder or disrupt the enforcement of internal revenue laws by filing frivolous lawsuits, taking frivolous positions in an effort to impede IRS audits and Collection Due Process Hearings, or engaging in other conduct intended to interfere with the administration and enforcement of the internal revenue laws;

(8) Preparing or assisting in the preparation of any federal income tax return for any other person;

(9) Engaging in any conduct subject to penalty under 26 U.S.C. § 6694 (preparing any part of a return or claim for refund that includes an unrealistic position);

(10) Engaging in any conduct subject to penalty under 26 U.S.C. § 6695 (failing to sign and furnish the correct identifying number on tax returns that they prepare); or

(11) Engaging in any other activity subject to injunction or penalty under 26 U.S.C. §§ 7407, 6694 or 6695, including fraudulent or deceptive conduct that substantially interferes with the proper administration of the internal revenue laws.

Further, pursuant to 26 U.S.C. §§ 7402 and 7407, the Court ORDERS that the defendants, if they have not previously done so, provide their complete list of people or other entities who bought any product or service, including tax-return preparation, from them or Freedom Books from January 1, 1999, through the present, in-

cluding names, addresses, phone numbers, e-mail addresses, and social security numbers or employer identification numbers, to counsel for the United States within ten days of the date of this Order. Schiff, Neun, and Cohen must each individually file a sworn certificate of compliance stating that he or she has complied with this portion of the Order, within ten days of the date of this Order.

Further, pursuant to 26 U.S.C. § 7402, the Court ORDERS that, within 10 days of the date of entry of this order, Schiff, Neun, and Cohen must place this Order, in its entirety, on the *www.paynoincometax.com,* and *www.ischiff.com* "Home" pages (i.e. the first page seen when accessing the websites at the listed addresses), prominently featured at the top so that it is easily visible.

Further, pursuant to 26 U.S.C. § 7402, the Court ORDERS that Schiff, Neun, and Cohen, at their own expense, provide a copy of this Order to each of their current customers (and former customers since January 1, 1999) within ten days of the date of this Order. Schiff, Neun, and Cohen must each individually file a sworn certificate of compliance stating that he or she has complied with this portion of the Order, within ten days of the date of this Order.